[Crim. No. 43.   First Appellate District.—June, 27, 1906.]

## THE PEOPLE, Respondent, v. DAVID TAYLOR, Appellant.

CRIMINAL LAW—MURDER—DISPUTE ABOUT WATER DITCH—SHOT FIRED INTO DITCH—STATEMENT OF DEFENDANT—HEARSAY.—Upon a trial for murder, where the killing arose from a dispute about the use of a water ditch, and defendant had testified that he fired the first shot into the water ditch, and there was no pretense on the part of the prosecution that such evidence was fabricated, or foundation laid to impeach it, and another witness had testified that after being informed by defendant of such shot, he found the bullet in the ditch, it was not error to refuse to allow him to be questioned as to a statement made by defendant to him at the time he told him of such shot. It was not part of the *res gestae,* and was purely hearsay, and a self-serving declaration, which was not admissible under any exceptional rule in support of credibility assailed.

ID.—INSTRUCTIONS—SELF-DEFENSE—AGGRESSION OF DEFENDANT.—The court properly instructed the jury that if they believed, from the evidence, beyond a reasonable doubt, that defendant wrongfully and unnecessarily brought on the struggle, and became and was the aggressor, and did not attempt to abandon or withdraw from the altercation, and during the altercation killed the deceased, the defendant could not avail himself of the plea of self-defense, in case he so created a real or apparent necessity for the killing by his own unlawful acts; and that the jury are the judges of the facts in the case.

Id.—APPARENT DANGER—IMMINENCY AT TIME OF KILLING.—Where the court fully instructed the jury as to the law of apparent danger, as favorably to the defendant as the law would justify, it was not error to state that such danger, "if any, must have existed at the very time the defendant fired the fatal shot." A defendant cannot justify the taking of human life upon the belief that danger is about to become imminent, or that it will in the future become imminent.

Id.—NATIONALITY OF DECEASED AND OF DEFENDANT.—Where counsel for defendant, in argument to the jury, spoke of the deceased as "this Armenian," and of the defendant as having a father and mother in the "good old state of Missouri," it was proper to instruct the jury that they had nothing to do with the place of birth or the nationality of the deceased, or the situation of the defendant or the deceased with reference to their families.

Id.—VERDICT FOR MANSLAUGHTER—INCLUSION OF PENALTY—INSTRUCTION—CORRECTION BEFORE RECORD.—Where the verdict was for manslaughter, and at first improperly fixed the term of imprisonment of the defendant, the court properly instructed them to eliminate the portion fixing the punishment, that the punishment was entirely for the court, but it was not a matter so arbitrary as to preclude a recommendation. The jury then properly retired and complied with the instruction, and the verdict was properly rendered after it was returned in due form, with a recommendation of defendant to the mercy of the court.

APPEAL from a judgment of the Superior Court of Fresno County, and from an order denying a new trial. Geo. E. Church, Judge.

The facts are stated in the opinion of the court.

James A. Burns, E. Klette, and S. J. Hinds, for Appellant.

U. S. Webb, Attorney General, for Respondent.

COOPER, J.—The defendant was charged in the information with having killed and murdered one Bedrosian on the twenty-eighth day of June, 1905. The jury returned a verdict of manslaughter, recommending the defendant to the mercy of the court, and he was sentenced to a term of six years in the state prison. This appeal is from the judgment and an order denying the defendant's motion for a new trial.

The homicide was the result of a dispute as to water rights from an irrigation ditch. The deceased and the defendant

each had a right to take certain water from the same ditch, but the trouble arose as to the time at which the water should be taken by each. The defendant could not get water below at times when deceased put extra boards in the head-gate and backed the water so that it would flow through a branch ditch onto the land of the deceased, and the deceased could not get the water to his land without putting in the extra boards. The defendant, from his own testimony, appears to have armed himself with a pistol on the morning of the homicide, as he was about to start to the point in the irrigation ditch where the boards had been placed by deceased. He made the declaration that he would have the water if it caused him trouble. When he reached the head-gate he took out two boards, the longest one of which he pushed out so it would float away down the ditch. As he was leaving he saw deceased down the road, and went to meet him. Deceased appeared to be in a good humor, and proposed to defendant that they measure the water. They then went together to the ditch, the deceased to his small head-gate, and defendant to the large head-gate. After deceased put his hand down into the water as if to measure it, he went from the small head-gate over to the large head-gate, and told defendant that he did not have enough water, and that he was going to put in the boards. Defendant replied that it would be all right, but that deceased would have to take out the boards if defendant had to flood the ditch to make him do it. Defendant testified that deceased had a shovel in his hands, and swore at defendant, calling him names, raising his shovel and striking at defendant, hitting his hands. The defendant then describes the subsequent events as follows: "I drew my gun from my hip pocket. I had carried that pistol ever since the 6th of January. Had been in the custom of carrying a pistol. I carried it for sport. When I pulled the revolver from my pocket, I put it over in my left hand and fired a shot down into the water. I did that as I thought probably I would run a bluff on him. I did not shoot at him. Could have shot at him if I had wanted to. When I fired the pistol he kind of dodged down, just kind of pitched the shovel back that way like. He kind of raised up then, and wanted to know what I meant. I said, 'I mean I don't want any more trouble with you.' Then I pointed the pistol in his face that way, and told him to stand back. He just

4 Cal. App.—3

kind of stepped back, probably one step, but a little toward the fence, a little northeast. I thought the trouble was all over with, and he hollered to someone, called him Paul or Izer, or something of that kind. I stuck the pistol in my hip pocket. I thought I would go across the ditch and get my wheel. I jumped from the running-board of the drop onto the bank. As I reached the ground he grabbed me. I whirled around facing him. I struck him a couple of times with my left hand. He caught me at that time so I couldn't use my right hand. I hit him on the breast or ribs. . . . . While we were scuffling there, I took the gun out of my pocket with my left hand. I put it over in my right hand, passed it in front of him to my right hand or around his neck. I told him if he did not let loose of me I would shoot. . . . At the time the shot was fired Paul was coming through the fence. I didn't aim to fire the shot just at that instant, but I would have had to fire in a second or two. When the shot was fired Bedrosian let loose of me. I ran out in the road.''

Defendant admitted that in the preliminary examination he testified as follows: ''I didn't think there was any necessity for defending myself with the gun. . . . The reason why I drew my gun the second time was that I thought I would run a bluff on him. I was not drawing the gun for the reason that I was afraid he was going to hurt me. I am not afraid of any one man. I was not afraid of him then. When I fired the first shot I then raised the gun up toward him with my left hand. He dodged down and threw the shovel around that way, and says something or other—I couldn't say what; he seemed so excited; but it sort of tickled me and I had a kind of grin; I couldn't help it.''

The witness, Saunders, testified that he heard a shot and looked up and saw deceased have hold of defendant's arm; that he heard deceased say, ''Don't shoot, don't shoot,'' and that he heard a second shot, and looked and saw deceased just about falling to the ground.

The above is stated for the purpose of more clearly elucidating the points discussed. It is not claimed that the evidence is insufficient to sustain the verdict.

It is urged that the court erred in sustaining objections to questions asked by defendant's counsel in direct examination of the witness, Tremper, as to what statement defendant made

to him at the time defendant told him of having fired the first shot into the water ditch. The court correctly sustained the objections. The witness had testified that he with others had searched the ditch at or about the point the shooting took place, and found a bullet in the bottom of the ditch, which was a 38-caliber bullet similar to the one found in the body of deceased; that the searching for the bullet was because of the statement made by the defendant to the witness about having fired a shot into the water. Counsel say that the object in asking the question was to corroborate the defendant by showing that he made a statement of a material fact, which proved to be true by an examination of the ditch. The court certainly was very liberal to the defendant by allowing in evidence the portion of the statement made to the witness as to having fired into the ditch. It was not permissible to allow the witness, without any restrictions, to state all that defendant said to him. It was not part of the *res gestae*, and was purely hearsay and a self-serving declaration. There was no claim made by the prosecution that the account or statement made by the defendant as to firing the bullet into the water was fabricated, and hence the rule cannot be invoked which, in some exceptional cases, allows statements made by a defendant at or about the time of the act to be received in evidence for the purpose of corroborating the statement or account he has given upon the stand. Where a defendant has given an account of a transaction, and the prosecution has attempted to impeach him by evidence as to a different account of the same transaction made to other parties, the law, in its spirit of fairness to the defendant, allows him to call other witnesses for the purpose of showing that other accounts or statements made by him immediately after the occurrence and while it was fresh in his mind are the same in substance as that given by him as a witness upon the stand. The question in such case is as to the credibility of the defendant or the witness. (See *People* v. *Doyell*, 48 Cal. 85.) In this case there was no such question to which the evidence sought to be elicited would have been admissible.

We have carefully examined the instruction complained of in which the court charged the jury that if they should find certain material matters as facts beyond a reasonable doubt, and that if the jury believed from such facts that defendant

wrongfully, unlawfully and unnecessarily brought on the struggle, or became and was the aggressor, and did not attempt to abandon or withdraw from the altercation, and during the altercation defendant killed deceased, that defendant could not avail himself of the plea of self-defense in case he did so create a real or apparent necessity for the killing, by his own unlawful acts. The objection urged to the instruction is that it "left the jury to infer that although they were the sole judges of the effect and value and weight of testimony, they were listening to a judge who really did have an opinion in regard to the guilt or innocence of the defendant."

It is certainly reasonable to infer that the judge really did have an opinion as to the guilt or innocence of the defendant, but we can find no expression or intimation of such opinion in the instruction. Not only this, but the judge said to the jury: "I again charge you that you, and not I, are the judges of the facts in the case; and I do not intend by giving these instructions to imply the existence or nonexistence of any fact in the case."

The claim is made that it was error for the court to charge the jury that "the danger to the defendant, if any, must have existed, or have reasonably appeared to exist, at the very time the defendant fired the fatal shot" in order to justify the killing. The portion of the instruction quoted must be read in connection with what is subsequently stated in the same instruction, to wit, "If you should believe from the evidence that at the time he did fire the fatal shot—if you find that he did so from the evidence—the defendant was at that time in no danger of suffering death or great bodily harm, and that the situation and surrounding circumstances were not such as to cause it to appear to the defendant as a reasonable person that, at the time, he was in danger of his life or of suffering great bodily injury, then I instruct you that, unless it did appear to the defendant as a reasonable man that he (the defendant) at the time of firing the fatal shot was in danger of suffering great bodily harm, then and under such circumstances the defendant could not justify the shooting and killing of the deceased upon the ground that the same was done in self-defense."

The instruction gives the rule as favorably to the defendant as the law would justify. If the criticism of appellant's

attorney is correct, then the danger need not have existed at the time the fatal shot was fired. It certainly is not the law that a defendant can justify the taking of human life upon the belief that danger is about to become imminent, or that it will in the future become imminent. There must have been reasonable ground to apprehend a design to commit a felony, or to do great bodily harm, and imminent danger of such design being accomplished, and this at the time the fatal shot was fired.

It was not error for the court to charge the jury that they had nothing to do with the place of birth or the nationality of the deceased, or the situation of the defendant or the deceased with reference to their families. The attorney for the defendant in his argument to the jury had many times referred to deceased as ''this Armenian,'' and to the defendant as having a father and mother in the ''Good old state of Missouri.'' The deceased, no matter what his nationality, was entitled to the equal protection of the laws, and defendant was not entitled to any special privileges because his father and mother lived in the state of Missouri. It would import a new principle into our criminal law if the place of birth or nationality of the parties concerned in the commission of a crime could be considered as material to the guilt or innocence of a defendant.

The defendant insists that the court erred in refusing to give requested instructions explaining the law of self-defense, and the right of a defendant to act upon appearances. We have examined the requested instructions which were refused and the instructions given, and we are of opinion that the material portions of the instructions refused were given elsewhere in the charge of the court. The instructions given by the court cover about ninety folios of the transcript and every phase of the case. While it may be said that they are unnecessarily voluminous, they show that the learned judge of the court below carefully guarded the rights of the defendant. To have repeated the substance of any of these instructions, even though in different words, could not have aided the jury, but would have tended to confuse them. The rights of the defendant were not only guarded, but the rulings on all doubtful questions were in his favor.

The claim that the verdict was obtained by means other than a fair expression of opinion of the jurors is entirely

without merit. The verdict as first rendered fixed the term of imprisonment of the defendant. The judge properly told the jury that it was informal, and instructed them to eliminate the portion of it fixing the punishment. One of the jurors asked the judge to inform them the penalty that could be imposed under a verdict of manslaughter. The judge in reply stated that the punishment was a matter entirely for the court, but that it was not "a matter that was so arbitrary as to preclude a recommendation or anything of that sort, but the jury have no power to fix it." No objection was made to the remark of the judge, and no exception taken to it. The jury then retired, and afterward brought in the verdict, accompanied with a recommendation of the defendant to the mercy of the court.

At the request of the defendant the jury was polled, and the verdict was then recorded.

We find no error in the record, and the judgment and order are affirmed.

Hall, J., and Harrison, P. J., concurred.