[No. E005418. Fourth Dist., Div. Two. Nov. 17, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
BRENDA DENISE ARIS, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1] Pursuant to *California Rules of Court,* rule 976.1, *this opinion is certified for publication* excluding parts IV-VI, which do not meet the criteria for publication set forth in California Rules of Court, rule 976(b).

**Counsel**

Appellate Defenders, Inc. and Roberta K. Thyfault, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Arnold O. Overoye, Acting Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Maxine P. Cutler and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**CAMPBELL, P. J.**—A jury convicted the defendant of second degree murder of her husband in August 1986. (Pen. Code, §§ 187, 189.)[2] The jury also found that the defendant personally used a firearm. (§ 12022.5.) Defendant was sentenced to 15 years to life, and the firearm use enhancement was stayed.

Defendant contends that the trial court erred: (1) in excluding expert testimony that the defendant was a battered woman and how that affected her mental condition at the time of the killing; (2) in refusing to instruct the jury on self-defense; (3) in instructing the jury on unreasonable self-defense and refusing to give three pinpoint instructions on that issue; (4) in instructing the jury about "heat of passion" and "cooling off"; and (5) in excluding evidence of the victim's violent character. Defendant also asserts as grounds for reversal prosecutorial and juror misconduct.

I

Facts

The defendant testified that her husband had beaten her, often severely, and that she had left him many times during their 10-year relationship. By a mixture of threats and cajoling, he invariably convinced her to take him back. Numerous witnesses for the defense testified to the beatings.

On the night of the killing, defendant testified that her husband beat her and threatened that "he didn't think he was going to let me live till the morning." She believed he was "very serious." She waited about 10 minutes to make sure he was asleep, then went next door to get some ice to ease the

---

[2] All section references are to the Penal Code unless otherwise indicated.

pain of the blows to her face. She found a handgun on the top of the refrigerator and took it "For protection." She testified she thought she needed it for protection because "I felt when I go back . . . he'd probably be awake and he would start hitting me again." Walking back to her residence she was thinking, "that I was tired of it. I'd had it." She denied intending to kill her husband at that time. When she returned to the bedroom, "I then sat down on the bed and I felt that I had to do it. It would be worse when he woke up." She testified that she had to do it "Because I felt when he woke up that he was then going to hurt me very badly or even kill me."

Defendant then shot her husband five times in the back while he was asleep in the bed on his side. The victim died of the gunshot wounds.

## II

### Self-defense and the Battered Woman

This case requires us to apply the law of self-defense in the context of a battered woman killing the batterer while he slept after he had beaten the killer and threatened serious bodily injury and death when he awoke. We first decide that the settled law in California requires an honest belief that the killer is in *imminent* danger of death or great bodily injury from the victim for both perfect and imperfect self-defense. Next we deal with the defendant's asserted right upon request to an instruction on reasonable self-defense and find no basis for giving such an instruction given the California definition of imminence. We find error in the trial court's exclusion of expert testimony about a psychological evaluation of the defendant that she suffered from battered woman syndrome and about how her experiences as a battered woman affected her state of mind at the time of the killing. However, we hold that in the unique circumstances of this case that error was harmless.

Self-defense is the subject of statutory and case law. The relevant portions of section 197 state: "Homicide is . . . justifiable when committed by any person in any of the following cases:

"· · · · · · · · · · · · · · · · ·

"3. When committed in the lawful defense of such person, . . . when there is reasonable ground to apprehend a design to commit . . . some great bodily injury, and imminent danger of such design being accomplished; . . ."

Section 198 makes an important qualification: "A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of the section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone."

■ For purposes of this opinion, self-defense may be analyzed as having two requirements: (1) the defendant's acts causing the victim's death were motivated by an actual (also referred to as "genuine" or "honest") belief or perception that (a) the defendant was in imminent danger of death or great bodily injury from an unlawful attack or threat by the victim and (b) the defendant's acts were necessary to prevent the injury; and (2) a reasonable person in the same circumstances would have had the same perception and done the same acts.

In California, perfect (also referred to as "reasonable" or "complete") self-defense requires both subjective honesty and objective reasonableness and completely exonerates the accused. Imperfect self-defense requires only subjective honesty and negates malice aforethought, reducing the homicide to voluntary manslaughter. (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 674-680 [160 Cal.Rptr. 84, 603 P.2d 1].)

1. *Instruction on Imminence*

■ Defendant contends that the trial court erred in instructing the jury on the meaning of imminence as it relates to imperfect self-defense and in refusing to give three instructions requested by defendant related to that issue. Our resolution of this issue also affects our ruling on the trial court's refusal to instruct on perfect self-defense and the harmlessness of the exclusion of the expert testimony. There was no error in the court's instructions on imminence. Initially, the trial court instructed the jury pursuant to CALJIC No. 5.17 (4th ed. 1987 pocket pt.) as follows in pertinent part: "A person who kills another person in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully, but does not harbor malice aforethought and cannot be found guilty of murder. . . ."

Defendant does not contest the correctness of this instruction. The instruction follows the law as set forth in *People* v. *Flannel, supra,* that the defendant must actually believe that the danger is imminent—a belief that there is danger but that it is not imminent will not suffice. Although the Supreme Court in *Flannel* quotes from *People* v. *Lewis* (1960) 186 Cal.App.2d 585 [9 Cal.Rptr. 263] which is not altogether clear on this issue

(see 25 Cal.3d at p. 675), the Supreme Court in *Flannel* and subsequent cases consistently requires an honest but unreasonable belief that the defendant is in imminent danger. (See, e.g.: 25 Cal.3d at p. 674 ["An honest but unreasonable belief that it is necessary to defend oneself from imminent peril" (italics removed)]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 354 [233 Cal.Rptr. 368, 729 P.2d 802] ["trial court instructed on voluntary manslaughter, correctly noting that 'there is no malice aforethought if the killing occurred . . . in the honest but unreasonable belief in the necessity to defend oneself against imminent peril' "].)

Throughout deliberations, the jury repeatedly requested clarification of the term "imminent." After several discussions with counsel and research by both counsel and the court, over objection by defense counsel, the trial court reread CALJIC No. 5.17, ascertained that this was the instruction with which the jury was having difficulty, and then gave the following instruction: " 'Imminent peril,' as used in these instructions, means that the peril must have existed or appeared to the defendant to have existed at the very time the fatal shot was fired. In other words, the peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with."

The trial court then once again instructed the jury pursuant to CALJIC No. 1.01 (1979 rev.) to remind them to consider the other instructions given about imperfect self-defense, of which the jurors had copies.

The jury adjourned to deliberate and soon returned with the verdict of second degree murder.

Defense counsel's objection was that the terms "imminent" and "immediate" must be differentiated, defining immediate as "something next in order, about to occur" and "more happening right away" and defining imminent as "more of a threatening and impending . . . and impending is something that might or is about to occur."

The trial court's ultimate definition of imminence was based on the judge's scholarly review of the leading cases, and we agree with it. These authorities all defined imminence in the context of perfect self-defense; however, as pointed out above, the elements of the belief do not differ in perfect and imperfect self-defense, only the reasonableness of the belief differs. Thus, these cases are good authority for use in the present context of imperfect self-defense.

■ The definition of imminence in California has long been well settled. "A person whose life has been threatened by another, whom he knows or

has reason to believe has armed himself with a deadly weapon for the avowed purpose of taking his life or inflicting a great personal injury upon him, may reasonably infer, when a hostile meeting occurs, that his adversary intends to carry his threats into execution. The previous threats alone, however, unless coupled at the time with an apparent design then and there to carry them into effect, will not justify a deadly assault by the other party. There must be such a demonstration of an immediate intention to execute the threat as to induce a reasonable belief that the party threatened will lose his life or suffer serious bodily injury unless he immediately defends himself against the attack of his adversary. The philosophy of the law on this point is sufficiently plain. A previous threat alone, and unaccompanied by any immediate demonstration of force at the time of the rencounter [*sic*], will not justify or excuse an assault, because it may be that the party making the threat has relented or abandoned his purpose, or his courage may have failed, or the threat may have been only idle gasconde, [*sic*] made without any purpose to execute it. On the other hand, if there be at the time such a demonstration of force . . . [indicating] that his adversary was on the eve of executing the threat, and that his only means of escape from death or great bodily injury was immediately to defend himself against the impending danger . . . ." (*People* v. *Scoggins* (1869) 37 Cal. 676, 683-684.) Understanding that the belief need *not* be reasonable for imperfect self-defense, the above quotation clearly sets forth the immediacy of the imminence requirement in California. (See also *People* v. *Tamkin* (1882) 62 Cal. 468, 470 [quoting *Scoggins*] and *People* v. *Fowler* (1918) 178 Cal. 657, 672 [174 P. 892] ["so urgent as to afford no reasonable mode of escape other than by killing"].)

■ "Any civilized system of law recognizes the supreme value of human life, and excuses or justifies its taking only in cases of apparent absolute necessity." (*People* v. *Jones* (1961) 191 Cal.App.2d 478, 482 [12 Cal.Rptr. 777].) "The danger which justifies homicide must be imminent [citation] and a mere fear that danger will become imminent is not enough." (*People* v. *Lucas* (1958) 160 Cal.App.2d 305, 310 [324 P.2d 933].) "It certainly is not the law that a defendant can justify the taking of human life upon the belief that danger is about to become imminent, or that it will in the future become imminent. . . . [There must be] imminent danger of such design being accomplished, and this at the time the fatal shot was fired." (*People* v. *Taylor* (1906) 4 Cal.App. 31, 37 [87 P. 215].)

In determining whether a victim presents an imminent danger, the defendant is entitled to consider all of the circumstances, including the victim's prior assaults on and threats to the defendant. (*People* v. *Bush* (1978) 84 Cal.App.3d 294, 302-304 [148 Cal.Rptr. 430]; *People* v. *Torres* (1949) 94

Cal.App.2d 146, 152 [210 P.2d 324] [interpretation of hand movement towards pocket].)

We distill from these cases the rule that a defendant should not be excused from guilt of murder when he or she kills the one who threatened death or serious bodily injury unless the defendant at least actually, if not reasonably, perceives in the victim's behavior at the moment of the killing an indication that the victim is about to attempt, or is attempting, to fulfill the threat. In making that evaluation, the defendant is entitled to consider prior threats, assaults, and other circumstances relevant to interpreting the attacker's behavior.

This definition of imminence reflects the great value our society places on human life. The criminal law would not sentence to death a person such as the victim in this case for a murder he merely threatened to commit, even if he had committed threatened murders many times in the past and had threatened to murder the defendant; it follows that the criminal law will not even partially excuse a potential victim's slaying of his attacker unless more than merely threats and a history of past assaults is involved.

■ Furthermore, batterers of women, even though they deserve punishment for their acts of battery, nevertheless are entitled to the same protection of their lives by the law that is afforded to everyone. That protection is the deterrence to would-be killers afforded by the knowledge that a killing with malice aforethought will be punished as a murder unless the killer actually perceived an imminent danger of death or serious bodily injury at the hands of the deceased.

While we recognize that applying such a rule in cases such as this one is difficult because of our sympathy for the plight of a battered woman and disgust for the batterer, it is fundamental to our concept of law that there be no discrimination between sinner and saint solely on moral grounds. Any less exacting definition of imminence fails to protect every person's right to live.[3]

---

[3] This fundamental principle of law is vividly articulated in a passage from A Man For All Seasons by Robert Bolt ((1960) p. 66). With his idealistic son-in-law, Sir Thomas More discusses his refusal to arrest Rich, the man who ultimately betrays More, despite the danger, obvious to all present, that Rich poses to More:
"MORE And go he should, if he was the Devil himself, until he broke the law!
"ROPER So now you'd give the Devil benefit of law!
"MORE Yes. What would you do? Cut a great road through the law to get after the Devil?
"ROPER I'd cut down every law in England to do that!
"MORE (Roused and excited) Oh? (Advances on ROPER ) And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? (He leaves him) This country's planted thick with laws from coast to coast—man's laws,

 In the specific context of this case, the defendant should not be excused from the penalty for murder merely because walking away from the sleeping victim will not avoid a future confrontation. The law cannot allow her to shoot her husband instead of, as was the case here, inconveniencing her out-of-state aunt by moving in with her or leaving her husband and firmly refusing to take him back. The law of self-defense, whether perfect or imperfect, does not provide an alternative means of resolving the battered woman's problem. For resolution of that problem, a battered woman must look to other means provided by her family, friends, and society in general such as restraining orders, shelters, and criminal prosecution of the batterer. While these means have proved tragically inadequate in some cases, the solution is to improve those means, not to lessen our standards of protection against the unjustified and unexcused taking of life.

We conclude the trial court's definition of imminence was correct. Other state courts have reached a similar conclusion in dealing with sleeping husband-victims who had battered their wife-killers. (See, e.g.: *State* v. *Norman* (1989) 324 N.C. 2253 [378 S.E.2d 8, 13-16] [sleeping husband-victim did not pose imminent danger to defendant and no support for perfect or imperfect self-defense instructions]; *State* v. *Stewart* (1988) 243 Kan. 639 [763 P.2d 572, 577] ["there must be some showing of an imminent threat or a confrontational circumstance involving an overt act by an aggressor"—self-defense instruction erroneously given where husband-victim was sleeping]. But see: *State* v. *Hennum* (Minn. 1989) 441 N.W.2d 793 [trial court did not rule out self-defense as a matter of law where husband-victim was sleeping and state supreme court did not discuss the question in ruling on admissibility of battered woman syndrome testimony]; *State* v. *Leidholm* (N.D. 1983) 334 N.W.2d 811 [ruling that reasonableness required for self-defense measured by subjective standard, but did not define imminence in context of sleeping husband-victim].)

Defendant contends that the trial court's definition of imminent limited the jury's consideration to the circumstances existing at the moment she shot her husband. This contention is meritless, the defendant admitting that the trial court had previously given the jury the instruction requested by defendant as follows in pertinent part: "One who has received threats against her life or person or has been . . . subject to prior assaultive conduct . . . is justified in acting more quickly and taking harsher measures for her own protection in the event of assault, either actual or threatened, than would be a person who has not received such threats or had not been assaulted . . . . [¶] If you believe from the evidence that the deceased . . .

---

not God's—and if you cut them down—and you're just the man to do it—d'you really think you could stand upright in the winds that would blow then? (Quietly) Yes, I'd give the Devil benefit of law, for my own safety's sake."

had threatened or assaulted the defendant, whether it be the night [of the killing] or sometime in the past, you may consider those factors as they impacted upon the state of mind of the defendant and her perception of the danger on the date [of the killing]."

■ Defendant argues that this instruction preceded the giving of the court's final definition of "imminence" by four days, and that the trial court should have given this instruction again as requested by defendant. We disagree. The trial court correctly determined that this was unnecessary because the trial court had already given the instruction, the jury had it in writing, and the trial court could, and did, direct the jury to consider the final definition of imminence in light of the earlier instruction about prior threats. After reading CALJIC No. 1.01, the trial court expressly told the jury, "It might be helpful, since you've been instructed on this particular instruction, that you do spend a moment and look through all of them again before you begin."

■ Defendant contends that the trial court erred by not giving the following three instructions she requested: "If you find that the defendant acted from the influence of an uncontrollable fear of imminent danger but the apprehension of imminent danger was not reasonable, then you must convict her of manslaughter. If you find that the defendant acted from the influence of an uncontrollable fear of imminent danger but not reasonably justified by the immediate circumstances, then you must convict her of manslaughter."

"In determining whether the defendant had an uncontrollable fear of imminent danger, you may consider the circumstances as they appeared to her when she acted and judge her by what a reasonable person so situated would do or might reasonably have done."

"Prior threats and abuse may be considered by you in determining whether the defendant reasonably perceived imminent danger."

Defendant's contention is easily refuted as to each of the three instructions. The first does not significantly differ from CALJIC No. 5.17, which was given to the jury again just prior to the final definition of imminence. The second was covered by the following language in the instruction on "prior threats" given at defendant's request and quoted above: "you may consider those factors as they impacted upon the state of mind of the defendant and her perception of the danger on the date [of the killing]." The third merely deals with "prior threats" again, the subject of the previously given instruction just discussed which the jury had, along with the other

instructions given, in writing all of which they were directed to review prior to recommencing deliberations for the final time.

We conclude that the three specifically requested instructions were the subject of instructions already given, and that, therefore, the trial court did not err in refusing them.

### 2. *Refusal to Instruct on Perfect Self-defense*

 Defendant contends that the trial court erred in failing to instruct the jury on reasonable self-defense. We disagree.

 A trial court need give a requested instruction concerning a defense only if there is substantial evidence to support the defense. (*People* v. *Flannel, supra,* 25 Cal.3d 668, 684-685 [no substantial evidence of diminished capacity].) Given the definition of imminent danger in California law as just discussed, in this case there was no evidence of any reasonable indication in the sleeping victim's behavior that he was about to attempt to harm the defendant. The proffered expert opinion in this case on the subjective reasonableness of the defendant's perception was irrelevant to the issue of a reasonable person's conduct, as will be discussed in the next section. We hold that defendant presented no substantial evidence that a reasonable person under the same circumstances would have perceived imminent danger and a need to kill in self-defense. No "jury composed of reasonable men could have concluded that" a sleeping victim presents an imminent danger of great bodily harm, especially when the defendant was able to, and actually did, leave the bedroom, and subsequently returned to shoot him. (25 Cal.3d at p. 684.)

The trial court did not err in declining to instruct on reasonable self-defense. As might be expected, the previously mentioned cases from other states using an objective standard of reasonableness and dealing with the propriety of self-defense instructions in the context of a sleeping husband-victim have ruled such instructions need not be given. (See, e.g.: *State* v. *Norman, supra,* 378 S.E.2d at pp. 13-16; *State* v. *Stewart, supra,* 763 P.2d at p. 577; and compare *State* v. *Hennum, supra,* 441 N.W.2d 793 and *State* v. *Leidholm, supra,* 334 N.W.2d at pp. 816-817 [held trial court incorrectly instructed on self-defense because did not reflect a subjective standard of reasonableness for perfect self-defense, and noted use of different, objective standard of reasonableness in California (see *People* v. *Cisneros* (1973) 34 Cal.App.3d 399, 418 [110 Cal.Rptr. 269]) and other states].)

 Defendant contends that the trial court erred in not giving some of the requested instructions on self-defense because they related to *imperfect* self-defense. We disagree.

The instructions on self-defense emphasized in this respect at oral argument that were refused in addition to CALJIC No. 5.12 (1979 rev.), the principal, reasonable self-defense instruction, included CALJIC Nos. 5.13 (1974 rev.—in lawful defense of self or another against a "forcible and atrocious crime" one "may act upon appearances"), 5.50 (4th ed.—assaulted person need not retreat), 5.51 (1977 rev.—apparent, not actual, danger required), and the defendant's requested "Special Instruction" Nos. 4 (similar to CALJIC No. 5.50, *supra*) and 8 (similar to CALJIC No. 5.51, *supra*).

We first observe that all of these refused instructions employed the "reasonable person" standard, which may have hurt defendant rather than helped in establishing unreasonable self-defense. Furthermore, even if they had been tailored properly, they were either unsupported by substantial evidence or covered by other instructions. The applicable parts of CALJIC Nos. 5.13, 5.51, and defendant's requested instruction No. 8, that "A person may act upon appearances whether such danger is real or merely apparent" (CALJIC No. 5.13) and only apparent danger is necessary, were covered by the "prior threats" instruction given by the court, quoted in the preceding section discussing the "imminence" instructions, which instructed the jury to consider the impact of the prior threats "upon the state of mind of the defendant and her perception of the danger . . . ." CALJIC No. 5.50 and defendant's requested instruction No. 4 on retreat are not supported by any evidence of an *assault,* as opposed to a *threat,* by the victim from which defendant need not have retreated.

We conclude that the trial court did not err in refusing to give these additional instructions on reasonable self-defense; they were not needed for the jury to understand the unreasonable self-defense instructions.

3. *Admissibility of Battered Woman Syndrome Testimony*

 Defendant contends that the trial court prejudicially erred by excluding expert testimony (1) that defendant was a battered woman based on the expert's psychological evaluation of the defendant and (2) "explaining how the psychological impact of being a battered woman affected her perception of danger at the time she shot her husband."

The trial court did admit expert testimony about the "battered woman syndrome" (BWS) in general, analogizing it to the "rape trauma syndrome" (RTS), held admissible for the purpose of "disabusing the jury of some widely held misconceptions about rape and rape victims" in *People* v. *Bledsoe* (1984) 36 Cal.3d 236, 249-250 [203 Cal.Rptr. 450, 681 P.2d 291], and to the "child sexual abuse accommodation syndrome" (CSAAS) which was

held to be similar to RTS in *In re Sara M.* (1987) 194 Cal.App.3d 585, 589-591 [239 Cal.Rptr. 605].

The trial court also excluded the proposed expert testimony that defendant shot the victim in honest self-defense while he slept and acted reasonably in doing so. This ruling was correct, and defendant expressly does not challenge it because she believes the admission of that testimony is prohibited by section 29. Section 29 forbids expert testimony that a defendant did or did not have the particular mental state required to commit the charged crime, including malice aforethought.

The expert in this case was Dr. Lenore E. Walker, a clinical and forensic psychologist who is a nationally recognized authority on battered women and is largely responsible for the development of BWS.

Dr. Walker defined a battered woman as one who has been, on at least two occasions, the victim of physical, sexual, or serious psychological abuse by a man with whom she has an intimate relationship. She defined BWS as "a pattern of psychological symptoms that develop after somebody has lived in a battering relationship." These symptoms include several that are particularly relevant to defendant's claim of self-defense.

One is a greater sensitivity to danger. "[T]hey don't misperceive it; they perceive it very honestly, but it's faster than somebody who [has not been] battered. And we call that a hypervigilance to cues of any kind of impending violence. That makes them . . . just a little bit more edgy, a little bit more responsive to situations than somebody who has not been battered might be." A woman who has been battered and then is threatened with more abuse is more likely to perceive the danger involved faster that one who has not been abused. The battered woman accurately senses when an abusive episode is not yet over.

Dr. Walker testified that BWS is not a mental illness and is not listed in the third edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-III), a comprehensive and authoritative diagnostic classification system of psychological disorders, to avoid stigmatizing abuse victims as having a mental illness. She testified that, nevertheless, BWS is a proper diagnosis and is recognized as a type of posttraumatic stress disorder, which is listed and defined in the DSM-III and which happens to anyone exposed to the degree and kind of trauma, such as a natural disaster or combat, that would be expected to cause psychological problems.

The abuse tends to follow a three-stage cyclical pattern of "tension-building," "acute explosion," and "loving contrition." Women who have killed

the batterer tend to do so most often during the "tension-building" stage because they lack the physical strength and/or skill to defend themselves during the "acute explosion" stage when the abuse occurs and because they are receiving the benefits of the relationship during the "loving contrition" phase.

Battered women tend to stay in the abusive relationship for a number of reasons. They are still being positively reinforced intermittently throughout the relationship and especially during the "loving contrition" phase. Women in general are trained to be the peacekeepers in a relationship, the one responsible to try to make the relationship work. They generally are taught to be optimistic and hopeful in relationships. These cultural characteristics of women in general apply to battered women. Terminating the relationship usually has adverse economic consequences. Separating from a battering partner may be very dangerous, and the battered woman is aware of the danger. The batterer may have threatened to kill the battered woman or to abscond with the children if she leaves. Many battered women have tried to leave and been unsuccessful. In a battering relationship, the woman loses self-esteem, is terrified, and does not have the psychological energy to leave, resulting in "learned helplessness" and "a kind of psychological paralysis."

It is not uncommon for a battered woman to kill the batterer while he sleeps. Particularly where the batterer abuses drugs and/or alcohol, an acute battering incident is often not completed at the time the batterer goes to sleep.

"Learned helplessness" is another aspect of BWS. The battered woman often does not know why she is beaten on any particular occasion. The violence is perceived by the woman as "random and aversive stimulation." Because of its randomness, she believes she is incapable of doing anything to prevent the abuse and, as a result, feels helpless. Women who attempt to defend themselves usually succeed only in eliciting laughter from the batterer and/or provoking more abuse, accentuating the feeling of helplessness.

At the Evidence Code section 402 hearing on the admissibility of Dr. Walker's testimony, she clarified the nature of her excluded testimony. With respect to the first category of excluded testimony mentioned above, Dr. Walker would have testified that defendant was a battered woman based on her psychological evaluation of the defendant. With respect to the second category, Dr. Walker would have used BWS "to explain the psychological symptoms and the psychological impact on the person's state of mind at the time of the homicide."

To answer the question of the admissibility of BWS on the issue of self-defense, we must determine the relevance of BWS testimony to self-defense.

The precise question we must first answer is whether an expert opinion that defendant acted reasonably in self-defense is relevant to the reasonableness requirement for perfect self-defense. The answer is determined by the nature of perfect self-defense as a criminal defense.

A homicide committed in self-defense is classified by the California Penal Code as a "justifiable homicide" as opposed to an "excusable homicide." (Compare §§ 195 and 197.) Excuses for homicide include accident and sufficient provocation (§ 195) as well as insanity and provocation (see 2 Robinson, Criminal Law Defenses (1984) § 173, at p. 280 et seq.) and a genuine, but unreasonable, belief in the need for self-defense (see *id.* at § 184(e), pp. 409-410, and *People* v. *Flannel, supra,* 25 Cal.3d 668, 674-675). Thus, reasonable self-defense is a defense of justification rather than of excuse under current California law.

 Justification declares the allegedly criminal *act* legal; excuse admits the act's criminality but declares the allegedly criminal *actor* not to be worthy of blame. (See: *Diola* v. *State Board of Control* (1982) 135 Cal.App.3d 580, 587-588 [185 Cal.Rptr. 511, 34 A.L.R.4th 640] [claimant convicted of homicide entitled to indemnification under § 4900 if later found to be justifiable because crime " 'was not committed at all' "]; Fletcher, *The Right and The Reasonable* (1985) 98 Harv.L.Rev. 949, 954-955; Creach, *Partially Determined Imperfect Self-Defense: The Battered Wife Kills and Tells Why* (1982) 34 Stan.L.Rev. 615, 630-631.) Therefore, justification requires an objective evaluation of the allegedly criminal *act*; excuse requires only a subjective evaluation of the allegedly criminal *state of mind*. (See: *People* v. *Furber* (1965) 233 Cal.App.2d 678, 685-686 [43 Cal.Rptr. 771] [§ 198 requires application of objective, rather than subjective, standard of fear for self-defense]; 2 Robinson, Criminal Law Defenses, *supra,* § 25(d), pp. 100-101; Dressler, *New Thoughts About the Concept of Justification in the Criminal Law: A Critique of Fletcher's Thinking and Rethinking* (1984) 32 UCLA L.Rev. 61, 79 ["exclusion of motive, then, is consistent with the idea that justification speaks only to the act and not to the actor"].)

 Thus, the questions of the reasonableness of a defendant's belief that self-defense is necessary and of the reasonableness of the actions taken in self-defense do not call for an evaluation of the defendant's subjective *state of mind,* but for an objective evaluation of the defendant's assertedly defensive *acts.* California law expresses the criterion for this evaluation in the objective terms of whether *a reasonable person,* as opposed to the *defendant,* would have believed and acted as the defendant did. We hold that expert testimony about a defendant's state of mind is not relevant to the reasonableness of the defendant's self-defense.

In this case, appellant concedes that the trial court correctly excluded Dr. Walker's proposed testimony that, "In my professional opinion, . . . [defendant] had a reasonable perception of danger." Dr. Walker's opinion was based on her conclusions about the defendant's mental processes which exhibited symptoms associated with BWS and which, in her opinion, derived from her experiences as a battered woman. However, as just explained, self-defense is not concerned with the reasonableness of the defendant's mental processes, but with what the hypothetical reasonable person would have done. Therefore, Dr. Walker's testimony is irrelevant to the issue of the reasonableness of the defendant's belief in the need to defend herself and the actions she took for that purpose. (See *People* v. *Czahara* (1988) 203 Cal.App.3d 1468, 1477 [250 Cal.Rptr. 836] [expert opinion that reasonable person would have been provoked to unreasoning passion impliedly held relevant but inadmissible because not beyond common experience].)[4]

Although Dr. Walker's opinion that defendant reasonably perceived herself to be in danger was irrelevant to the reasonableness of her self-defense because it was based on an evaluation of her subjective mental state, for that very reason Dr. Walker's opinion slightly reframed is highly relevant to the first element of self-defense—defendant's actual, subjective perception that she was in danger and that she had to kill her husband to avoid that danger. Not only is the opinion relevant to the excuse of imperfect self-defense which requires only an actual perception, but also the justification of complete self-defense because it requires both actual as well as reasonable perception.

The relevance to the defendant's actual perception lies in the opinion's explanation of how such a perception would reasonably follow from the defendant's experience as a battered woman. This relates to the prosecution's argument that such a perception of imminent danger makes no sense when the victim is asleep and a way of escape open and, therefore, she did not actually have that perception.

However, Dr. Walker's opinion is inadmissible to the extent that it is testimony "the defendant had or did not have . . . malice aforethought

---

[4] Under this analysis, section 29 does not apply. Section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." We note that the prohibition in section 29 against testimony as to the defendant's mental state does not exclude Dr. Walker's opinion insofar as it relates to the reasonableness of defendant's belief and acts in self-defense, because the reasonableness is *not* a question about the defendant's *mental state* but about her *acts*. Thus, that opinion was correctly excluded *not* on the ground that it violated section 29, but on the ground that the opinion was irrelevant.

. . . ." (§ 29.) Since having an actual perception that one is in imminent danger negates malice aforethought (compare *People* v. *Czahara, supra,* 203 Cal.App.3d at p. 1477 [heat of passion upon sufficient provocation negates malice aforethought]), we hold that Dr. Walker was properly prohibited from stating an opinion that defendant actually perceived that she was in imminent danger and needed to kill in self-defense.

Nevertheless, it was error not to permit Dr. Walker to testify, based on her experience and BWS theory, as to how the defendant's particular experiences as a battered woman affected her perceptions of danger, its imminence, and what actions were necessary to protect herself. An expert's opinion about a defendant's mental state does not violate section 29 as long as the expert does not express an opinion on the ultimate issue that defendant did or did not have a mental state required for a charged offense. (*People* v. *McCowan* (1986) 182 Cal.App.3d 1, 14 [227 Cal.Rptr. 23]. See also: *People* v. *Whitler* (1985) 171 Cal.App.3d 337, 341-342 [214 Cal.Rptr. 610] [§ 29 did not exclude psychiatric testimony about defendant's mental condition at time of killing relevant to diminished "actuality" defense]; *People* v. *Jackson* (1984) 152 Cal.App.3d 961, 969-970 [199 Cal.Rptr. 848] [§ 29 did not preclude testimony that killing "was a direct product of . . . mental disease"].) Dr. Walker's proposed testimony that defendant was a battered woman and how being a battered woman affected defendant's perceptions and conduct stops short of the ultimate issue of what defendant's perception actually was and, therefore, does not violate section 29.[5]

---

[5] Other state courts have varied considerably in their handling of BWS testimony, in part depending on whether they employ a subjective or objective standard of reasonableness or have statutory or case law similar to section 29. (See, e.g.: *State* v. *Norman, supra,* 378 S.E.2d at pp. 9, 11-12 [under objective standard of reasonableness of self-defense, defendant convicted of voluntary manslaughter with general testimony on BWS as well as on psychological evaluation of defendant and opinion that defendant had BWS and that "it appeared reasonably necessary" to the defendant that she kill her husband; however, opinion did not address admissibility of BWS testimony]; *State* v. *Stewart, supra,* 763 P.2d at pp. 574, 577, 579 [under objective standard, defendant acquitted of first degree murder on testimony that defendant suffered from BWS and had a " 'really grave lethal situation' "; opinion held BWS "relevant to a determination of the reasonableness of the defendant's perception of danger"]; *State* v. *Hennum, supra,* 441 N.W.2d at pp. 794, 797, 798-799 [under standard not discussed, defendant convicted of unintentional, second degree felony murder with testimony on BWS in general and opinion that defendant suffered from BWS; court affirmed but held BWS testimony to be "limited to a description of the general syndrome" but not "as to the ultimate fact that the particular defendant actually suffers from battered woman syndrome"]; *State* v. *Leidholm, supra,* 334 N.W.2d at pp. 816-817 [under subjective standard, defendant found guilty of voluntary manslaughter with testimony on BWS in general and that defendant had BWS; court held both types of testimony admissible on reasonableness and existence of belief in imminent danger]. See also, e.g.: *State* v. *Kelly* (1984) 97 N.J. 178 [478 A.2d 364, 375-377]; *People* v. *Torres* (1985) 128 Misc.2d 129 [488 N.Y.S.2d 358, 360]; *Terry* v. *State* (Fla.App. 1985) 467 So.2 d 761, 763-764; *State* v. *Thomas* (1983) 13 Ohio App.3d 211 [468 N.E.2d 763, 764-766].)

 Although BWS testimony is admissible, both in general and as it applies to the particular defendant, trial courts should recognize the possibility that the jury in a particular case may misuse such evidence to establish the reasonableness requirement for perfect self-defense, for which purpose it is irrelevant as previously discussed. Therefore, upon request whenever the jury is instructed on perfect self-defense, trial courts should instruct that such testimony is relevant only to prove the honest belief requirement for both perfect and imperfect self-defense, not to prove the reasonableness requirement for perfect self-defense.

 Respondent contends that Dr. Walker's proffered opinion testimony that defendant was suffering from BWS should be analogized to CSAAS and RTS and excluded under the authority of *People* v. *Bledsoe, supra,* and *People* v. *Bowker* (1988) 203 Cal.App.3d 385 [249 Cal.Rptr. 886]. We disagree.

Both *Bledsoe* and *Bowker* dealt with opinions that a rape or child abuse victim's behavior were evidence that the victim had actually been raped or abused. These opinions were held inadmissible unless they could satisfy the *Kelly-Frye* test, which they could not, essentially because CSAAS and RTS were not developed for the purpose of proving the crime had occurred.

In contrast, the BWS testimony in this case was not used to prove defendant had been battered, but to prove defendant genuinely perceived imminent danger and a need to kill the victim. As explained above, this testimony is expert psychological testimony as to the defendant's state of mind at the time of the killing and is indistinguishable from identical types of opinion testimony in the context of diminished "actuality" defenses.

4. *Harmless error*

The trial court's error in excluding Dr. Walker's testimony (1) that defendant was a battered woman based on the expert's psychological evaluation of the defendant and (2) "explaining how the psychological impact of being a battered woman affected her perception of danger at the time she shot her husband" was not prejudicial because of the particular circumstances of this case.

BWS testimony is relevant to show that the defendant genuinely believed she was in imminent danger of serious bodily injury. However, where as in this case the defendant's own testimony establishes facts tending to show quite conclusively that there was nothing in the victim's behavior indicating the existence of an imminent danger as that term is defined by California law, it is not reasonably probable that BWS testimony will convince the jury

that, nevertheless, the defendant honestly perceived an imminent danger resulting in a different verdict.

Those facts included that the victim was asleep, that she left the room, that she returned to the room and thought it over before she shot him while he was still sleeping. Shooting a sleeping potential attacker is very close to killing an actual attacker after having rendered the attacker incapable of continuing the assault—the danger existed in the past but does not exist at the time of the assertedly defensive assault. (*People* v. *Gleghorn* (1987) 193 Cal.App.3d 196, 202 [238 Cal.Rptr. 82] [assault victim in barn loft hit defendant on floor with arrow, then abandoned weapon and swung down to floor where assaulted—victim no longer presented danger after descending from loft].) In this case also the danger did not exist at the time of the assault, although it probably would in the future. No matter what the expert testimony, it is not reasonably probable that a jury would find defendant actually believed she was in *imminent* danger.

Moreover, in this case the jury heard extensive BWS testimony, albeit of a general nature, explaining the trapped and helpless feelings and hypervigilance experienced by repeatedly battered women. That testimony included the fact that battered women not infrequently kill the batterer while he sleeps. ██ However, the jury rejected imperfect self-defense in convicting defendant of second degree murder on an inadequate provocation theory.[6]

---

[6] Defendant asserts that we may consider the statement of a juror in arriving at the verdict in determining whether the error is harmless. Juror Biddle is reported to have said that she did not think the defendant suffered from battered woman syndrome because Dr. Walker did not testify that she did. This statement is about the juror's subjective thought processes (see Evid. Code, § 1150, subd. (a)), and may not even be considered on the issue of juror misconduct, much less harmless error in the exclusion of evidence. At oral argument, counsel for defendant argued that Juror Biddle's statement was admissible under section 1150, subdivision (a), as an objectively verifiable fact and was not just evidence of a juror's subjective thought processes. It is true that a juror's statement that itself constitutes misconduct is admissible, such as a juror's statement of law not given in jury instructions. (*In re Stankewitz* (1985) 40 Cal.3d 391, 396-397 [220 Cal.Rptr. 382, 708 P.2d 1260].) However, defendant does not contend that Juror Biddle's statement was itself misconduct and, in attempting to show how the exclusion of Dr. Walker's testimony was not harmless error, defendant is using the juror's statement as evidence of her subjective thought processes, not as evidence of misconduct per se. Furthermore, if the law were that reviewing courts could consider jurors' statements about the effect of error on the verdict, jurors would be hounded for their statements by losing parties in every case, not just in cases of juror misconduct, and the whole nature of appellate review for prejudice would be degraded from a consideration of the objective record to an attempt to delve into the thoughts, feelings, and motivations of the jurors who often would not accurately be able to trace or articulate their different paths to the verdict. Such a trial of the jury would make the jury system completely unworkable.

■■■ We find that a different verdict was not reasonably probable if the erroneously excluded testimony had been admitted. (Evid. Code, § 354; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### III

### INSTRUCTIONS ABOUT FEAR AND THE HEAT OF PASSION

■■■ Defendant contends that the trial court had a sua sponte duty to instruct the jury that there is no cooling-off period when fear has grown over time, as in this case, and further contends that CALJIC No. 8.44 should not have been given without modification, sua sponte, because it states, according to defendant, that "fear alone is insufficient for heat of passion." Both contentions are erroneous.

The trial court instructed the jury as follows in pertinent part: "There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion, or in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury." (CAL-JIC No. 8.40 (1979 re-rev.).)

"To reduce an intentional felonious homicide from the offense of murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of such character and degree as naturally would excite and arouse such passion and the assailant must act under the smart of that sudden quarrel or heat of passion.

"The heat of passion which will reduce a homicide to manslaughter must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as would have aroused the passion of an ordinarily reasonable man faced with the same situation. The question to be answered is whether or not at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rationally and without deliberation and reflection and from such passion rather than from judgment.

"If there was provocation, but of a nature not normally sufficient to arouse passion, or if sufficient time elapsed between the provocation and the fatal blow for the passion to subside and reason to return and if an unlawful killing of a human being followed such provocation and had all the

elements of murder as I have defined it, the mere fact of slight or remote provocation will not reduce the offense to manslaughter. (CALJIC No. 8.42 (1979 rev.).)

"Neither the emotion of fear of itself, nor the emotion for revenge of itself, nor any or all of those emotional states in and of themselves constitute the heat of passion referred to in the law of manslaughter which I have stated to you. Any or all of such specific emotions may be involved in the heat of passion that causes judgment to give way to impulse and rashness but also any one or more of them may exist in the mind of the person who acts deliberately and from choice following his own reasoning, howsoever good or bad it may be. Hence the law sets up the standard and requires the test I have previously stated to you for determining whether or not the defendant acted under heat of passion." (See CALJIC No. 8.44 (4th ed.).)

The trial court also gave the following instruction requested by defendant: "Passion may be any violent, intense, high wrought or enthusiastic emotion.

"The defendant's heat of passion must be due to sufficient provocation. Verbal provocation may be sufficient to arouse heat of passion.

"Heat of passion may be aroused by a series of events over a considerable period of time."

Reading this last sentence of the instruction given at defendant's request together with the instruction pursuant to CALJIC No. 8.42 stating that sufficient time may lapse after the provocation to permit "the passion to subside and reason to return," we do not see where any error has been made or clarification is required. Defendant asserts that in this case the fear built up over a long period of time and, therefore, could not be subject to a "cooling off" period. This characterization of the case ignores the fact of the victim's assault upon and threats to the defendant before the victim fell asleep. Certainly it cannot be the position of the defendant that the assault and threats did not add to the underlying fear she had of the victim which had grown over the years. It proves too much to say that the defendant's underlying fear alone was sufficient to justify the killing; if that were so defendant could have shot her husband to death at any time and not be guilty of murder. A reasonable inference from the facts is that the defendant experienced a peak of fear while she was beaten and threatened which must have subsided somewhat after the assault and threats ended. Thus, the instruction about "cooling off" was necessary to direct the jury's attention to the issue of whether the fear attributable to the last round of beating and threats had subsided by the time the defendant had returned with the gun.

The jury could be expected to understand that the cumulative fear could not have subsided during any "cooling off" period because it had not been produced by the provocation that preceded the "cooling off" period. We hold the instructions adequately dealt with the "cooling off" period as it related to the fear which assertedly caused the killing in this case.

As to defendant's second contention that CALJIC No. 8.44 is erroneous as applied to this case because it states that fear alone does not suffice for heat of passion, defendant misconstrues the instruction. The correct interpretation of the instruction as given in this case is that neither fear nor revenge, of itself, constitutes heat of passion because either or both of these emotions may constitute heat of passion. Defendant's interpretation makes no sense because it would mean that the jury would have to find at least two or more emotions involved in every case of voluntary manslaughter by heat of passion. We hold that CALJIC No. 8.44 correctly allows fear to suffice for heat of passion without identifying heat of passion exclusively with fear.

IV-VI*

. . . . . . . . . . . . . . . . . . . .

VII

DISPOSITION

The judgment is affirmed.

McDaniel, J., and Dabney, J., concurred.

A petition for a rehearing was denied December 5, 1989, and appellant's petition for review by the Supreme Court was denied March 1, 1990. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 1178.