Filed 5/5/23 P. v. Lee CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM BLOWHEART LEE,<br><br>Defendant and Appellant. | F083261<br><br>(Super. Ct. No. BF181306A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. David R. Zulfa, Judge.

Candace Hale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant William Blowheart Lee fired five shots through the glass entry door of a marijuana dispensary, hitting and killing Jerry Lee Tibbs, Jr., a security guard sitting

inside the shop. A jury convicted Lee of second-degree murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (b); count 1),[2] shooting at an occupied building (§ 246; count 2), felon in possession of a firearm (§ 29800, subd. (a)(1); count 3), and felon in possession of ammunition (§ 30305, subd. (a)(1); count 4). As to counts 1 and 2, the jury found Lee personally used a firearm (§ 12022.53, subd. (d)). In a bifurcated bench trial, the court found Lee had two prior serious felony convictions (§ 667, subd. (a)), and two prior strikes under the Three Strikes Law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).[3]

On the base-term murder conviction, Lee was sentenced to an aggregate 85 years to life, comprising an indeterminate term of 50 years to life, a consecutive 25 years to life for the gun-use enhancement, and a consecutive 10-year determinate term for the two prior serious felony convictions.

On the subordinate counts, for firing into an occupied building Lee was sentenced to an aggregate 42 years to life, consisting of an upper term of seven years, plus 25 years to life for the gun-use enhancement, plus the 10-year determinate sentence for the serious felony priors. For being a felon in possession of a gun and ammunition, the court imposed upper-term sentences of three years for each, which were doubled to six years for a prior strike. The sentences imposed on all three subordinate counts were stayed pursuant to section 654.

Lee appeals, claiming:

(1) The trial court prejudicially erred by refusing to instruct the jury on justifiable homicide based on a theory of perfect self-defense.

---

[1] All undesignated statutory references are to the Penal Code.

[2] The jury acquitted Lee of deliberate and premeditated first-degree murder and instead convicted him of the lesser included offense of second-degree murder.

[3] The serious felony priors and the strikes were based on two criminal threats convictions (§ 422) from 2010 and 2019. They are not contested on appeal.

2.

(2) The court also erred by refusing to modify its imperfect self-defense instructions so as to include a defense pinpoint instruction using language taken from perfect self-defense "that someone who has been threatened in the past is justified in acting more quickly or taking greater self-defense measures."

(3) Remand for resentencing is required because of retroactive legislative changes made to sections 654, 1170, and 1385 after Lee's original sentence was imposed in 2021.

The People respond that there was no prejudicial instructional error. They concede that remand for resentencing is necessary because of changes made to section 1170 but contend we need not address the changes made to sections 654 or 1385 because Lee "has already attained the [remand] remedy he seeks…."

We find no instructional error. However, we agree with Lee that the matter must be remanded for resentencing in light of *all* the recent changes made to the sentencing laws. The judgment is therefore affirmed in part, reversed in part, and remanded for further proceedings.

## FACTS

Because the basic facts of the offenses themselves are not in dispute — only their meaning as they pertain to self-defense — we need not lay them out in great detail. We instead concentrate on the facts specifically relevant to the instructional issues Lee has raised. Because Lee does not challenge the sufficiency of the evidence to support his convictions, under established appellate standards we recite the facts in the light most favorable to the judgment. (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3 (*Curl*).) We include this reminder because Lee's rendering of the facts focuses almost entirely on the evidence provided by his testimony and his self-serving post-arrest statements made to the police, to the exclusion of the other evidence.

3.

At about 9:40 p.m. on the night of June 3, 2020,[4] Lee was standing outside a Bakersfield marijuana dispensary when he claimed he heard someone call out something like, "Hey." He was not certain, but he suspected it had been Jerry Lee Tibbs, Jr. (Tibbs), a security guard at the shop and someone with whom Lee was familiar. Lee took out the handgun he was carrying and fired five times through the glass doorway of the dispensary where Tibbs was sitting, killing him. As a twice-convicted felon, Lee was prohibited from having a gun or ammunition.

Those were the charged crimes, but it is their back story that is the focus of our discussion.

When these events occurred, Lee was a 33-year-old former gang member who had turned informant and prosecution witness. About six years before the current incident, in a case involving Lee's old gang (the Country Boy Crips) and their primary gang rival (the East Side Crips), Lee had testified against members of his own gang. Obviously, such a "snitch" forever thereafter runs a serious risk of threats, assaults, and even being killed. Police relocated Lee to Visalia for his protection, but he quickly violated the terms of the witness protection agreement, the police stopped supporting him, and he returned to Bakersfield. Lee said that despite being labeled a "rat," in the intervening years he "was able to move around a little bit just between the cracks."

Because of various unrelated domestic difficulties, Lee was basically homeless and was living in a car parked in his sister's carport a block away from the marijuana shop. The dispensary was an East Side Crips hangout ostensibly owned by McKinley Womack, an East Side Crip. A police detective opined that Tibbs was also an East Side Crip affiliate.

On May 19, two weeks before the killing, Lee was drinking beer in the alley behind the dispensary when Tibbs came outside and told him to leave. Lee thought he

---

[4] Subsequent references to dates are to dates in 2020 unless otherwise stated.

4.

"wasn't causing any problems," so he refused. Tibbs went inside but soon came back out and again told Lee to leave. Lee said he did not have to leave, and that Tibbs could not tell him where to go or what he had to do. Lee said Tibbs took a few swings at him but missed. He claimed Tibbs then asked him if he wanted some "weed" or money, but Lee replied that he did not need anything. Meanwhile, Womack had come up from behind, knocked Lee down with a punch to the jaw, and then followed by brandishing a derringer.[5]

Lee gave two inconsistent accounts of what happened next. When originally interviewed by police, Lee said that he felt like "standin' up for [him]self," so he started "talkin' mess" and "talkin' smack, talkin', talkin', talkin' smack." "And it escalated. So I started talkin' smack, talkin' smack, talkin' smack." About "6-10" other men then came out of the shop and beat him up: "They just jumped me because I started talkin' smack." Notably, Lee admitted nothing gang-related was ever said or implied; he believed they were just trying to get him to leave the area.

At trial, however, Lee said that after being knocked down by Womack, he went home and noticed his cell phone was missing. He came back to the dispensary to see if they had his phone, but when he went up to the front door to ask, someone pepper-sprayed him in the face, "six to seven" people came out of the shop, backed him down the alley, like a "deer with six hyenas backing it into a corner," and then beat him up. However, none of them was armed.

Lee made a cell-phone video of himself afterwards, showing and describing his injuries from the beating. They were minor, however, and he did not seek medical attention. In this video, he said, "I have no choice … but what they did to me is not

---

[5] We presume it was a derringer. Lee called it a "deuce-deuce Dillinger" but clarified it was "like those little small double barrel guns" and agreed that the "deuce-deuce" may mean the barrels' .22 caliber bore.

5.

acceptable. So, I have to defend myself because now, I'm in fear that they gonna come back and do something more to me knowing that I'm on the streets. … To be continued."

After the May 19 event, Lee said he had no more "personal interactions" with Tibbs until he killed him on June 3. He admitted he had never again been "confronted by [Tibbs] either verbally or physically."

On May 20, Lee went to the liquor store located next door to the dispensary.[6] A group of six or seven "gentlemen" came "straight into the store," "[a]ggressively telling" Lee that he had to leave, that he was not supposed to be there, and that it was not his neighborhood. Tibbs was not in this group either.

Someone in the group used a phone to record the incident, a recording that eventually went up on Facebook. It showed Lee "standing inside a liquor store with a startled look on his face with his hands up while you could hear several other people … making … derogatory comments towards [him]." Lee told them that he did not have to leave, but later said he was afraid — so afraid in fact that he urinated on himself.

Later, when Lee saw the video on Facebook, he realized there were gang undertones to the situation as he read the comments. There was "a back and forth between people affiliated with the East Side Crips, as well as the Country Boy Crips…." There also were derogatory comments about Lee "urinating on himself" and some threats; one even identified Lee as an "ex-gang member" and a "rat."

Although many of the comments merely mocked or made fun of Lee, some threatened him with future assaults, such as one promising to assault Lee and make him

---

[6] The dispensary and the liquor store were adjacent businesses in the same commercial building situated perpendicular to the street. The liquor store was on the north end of the building, on the street, and the dispensary was on the south end, on an alley. Lee's sister's carport was one block directly north of the liquor store; in a photo taken from the liquor store parking lot, the apartment building where Lee's carport was located was visible. Thus, coming from the carport, Lee could go directly to the liquor store without needing to pass the dispensary.

"shit" himself the next time. None was a death threat, however; they were only threats to "beat his ass." All told, the post had about 147 comments and was shared 39 times. As Lee read the comments, he said "the mental anguish just built up and built up, especially after all those years of the strife that I had to go through[.]"

Both to police and later in his trial testimony, Lee made a variety of sometimes inconsistent statements regarding his fears, plans, motivations, and his mental distress after the Facebook post had circulated.

Because of being assaulted in the alley and intimidated in the liquor store, Lee said he was in fear of the East Side Crips and felt his life was in danger. He told police it was these fears that triggered his reaction to hearing "Hey" just before he opened fire on June 3. He explained that when he first saw Tibbs standing near the door to the dispensary and then turn and go back inside that: "[W]hen [Tibbs] went in [the dispensary] he was like, 'Hey.' And I thought they was gonna come out and they was gonna try and get me." He was "thinkin' [Tibbs was] callin' the same guy who had a [derringer] was gonna come out." "I don't know who [Tibbs] was speaking to in the store. But … I'm thinkin' that they gonna come back out and do what they did to me again." As he subsequently put it, the "Hey" was "[t]he reason why I got ready." Of course, he did more than merely "get ready" and, in actuality, no one ever came out.

Lee also gave different stories to explain why, despite his claims of mortal fear, he had armed himself with a gun — stolen from another of his sisters sometime between May 21 and May 23 — and *went back* to the dispensary on the night of June 3. To the jury, he said that he just "got up and … went for a walk" after "sitting there dwelling on all the things that had been going on in [his] life."

More revealing, during his interviews with police detectives he related two additional, and quite different, stories. Lee initially insisted he went back because his sister kept asking him to go to the liquor store for her, despite his having earlier been confronted and threatened inside the store, and even against the advice of his estranged

7.

wife. However, surveillance video taken from inside the liquor store at 7:26 p.m. that evening — more than two hours before the 9:40 p.m. shooting — showed Lee making a purchase, and wearing the same clothing he was wearing when he later returned and shot Tibbs.[7]

Lee eventually admitted he really went back to the area for more proactive reasons: "The things that I did, the way I went about it, was wrong. Because … it was more like I became the aggressor afterwards because of my mental anguish…. I became the aggressor after the fact because I was in fear of my life. So, I had to do what I had to do in order to be sure, you know, that this guy wasn't going to come and kill me. And the next guy wasn't going to come and kill me. And the next guy wasn't going to come and kill me."

One interviewing detective said to Lee: "[T]hat's what we're getting at. When … you walked to the [dispensary] that night, and you saw [Tibbs] at the door and you started shooting him, he wasn't assaulting you." Lee admitted: "He didn't assault me … [h]e didn't pull a gun on me or anything like that…. You're right. I became the aggressor at that point. I became the aggressor out of fear and wanting to make sure th[ese] guys didn't have a chance to kill me first. . . . I made that decision to be sure that I wouldn't die first. … I just felt like I had to take care of business before these guys killed me."[8]

Another detective asked Lee, "Why walk in front of a business where people hate you?" Lee replied, "You make a good point there, a very strong point." Lee

---

[7] As noted above, Lee could have gone directly to the liquor store from his sister's carport without having to go near the dispensary. Instead, he circled around the other side of the building to the alley south of the liquor store and then approached the dispensary half of the building from the opposite direction.

[8] About Tibbs, Lee said: "I'[d] never even seen that man before [May 19]. … I d[id]n't know his name. I d[id]n't know anything about him. The only thing I heard was this guy has a lot of beef with a lot of different people. And he's from the East Side." Nonetheless, at the time of the May 19 incident in the alley, Lee admitted he did *not* know that Tibbs was an East Side Crip.

acknowledged that when he saw Tibbs outside the doorway of the shop, he did not see any gun on him. When asked, "Then what made you start shooting?" Lee would only say, "No comment."[9]

While they watched the June 3 surveillance video taken by a camera outside the liquor store,[10] Detective Rob Robles and Lee had the following conversation:

"[Robles]: And just seein' how you walk up. And you kind of creep up on [a parked] vehicle using it as cover. And you're kind of – you're watching the [dispensary]. You're creepin' along.

"[Lee]: It looks like retaliation to you right?

"[Robles]: It does.

"[Lee]: Yeah I know. I understand that completely.

---

[9] Police found five spent 9mm shell casings and a few bullet fragments about 10 to 15 feet outside the front door of the dispensary. All five casings came from the same gun. The glass front door had three "bullet strikes" through the glass and there were several "bullet strikes" found on an interior wall. When police arrived, Tibbs was sitting in a chair just inside the doorway, with a single fatal bullet wound to his right chest, the entry path of which was in a downward trajectory.

In a subsequent search of the carport, police found a single expended 9mm shell casing and various items of men's clothing both in the car and a storage area. When arrested on June 5, Lee directed officers to his backpack where they found a loaded 9mm semi-automatic handgun with a single round remaining in the magazine.

[10] Surveillance cameras inside the dispensary were apparently only for show because they were not attached to recording devices. However, one of the liquor store's exterior cameras showed "a male walking from the direction of the *south* alley walking by the front door [of the dispensary] and several loud sounds consistent with sounds of gunshots as [the male] is pointing an object in the direction of the front door; and then fleeing ultimately *north* along th[e] liquor store and then northeast from there." (Italics added.) As noted, Lee's carport was one block northeast of the shooting location; a detective measured the distance from the carport to the dispensary as 556 feet.

Another southwest-pointing surveillance camera that was located at the back of a post office just east of the liquor store building showed the same individual coming down the alley south of the dispensary and then turning north into the parking lot where the door to the dispensary was located.

"[Robles]: And then so you get – I don't know if it's an employee or a customer or somebody else walks out of the door and starts walking … towards the alley.

"[Lee]: You mean the lady … that came out?

"[Robles]: Right.

"[Lee]: Yeah that's probably when [Tibbs] said somethin' to me.

"[Robles]: [A]nd is there a reason why you didn't shoot her?

"[Lee]: For what? She didn't…

"[Robles]: Exactly. She did nothin' wrong to you right?

"[Lee]: It's a innocent lady.

"[Robles]: Ri– Exactly. But you see [Tibbs] … And that's when you shoot him. So it's one thing if you're just beboppin' along and you're just walkin' from the alley to the [liquor] store. And he's yellin' out 'Hey.' And then you see the stampede of East Siders comin' out at you. That's a completely different animal….

"[Lee]: I get exactly where you comin' from.

"[Robles]: And I'm seein' you creepin' up [in the surveillance video]. And you're not creepin' up to wait until [Tibbs] turns around so you can make your way to the [liquor] store so no one will see you go in and go buy [what Lee's sister purportedly wanted] right?

"[Lee]: Mm-hm."

Lee conceded it "[s]ounds … like it's premeditated but … I had to do what I had to do because I was going to die. Point blank, period…. These guys was going to kill me."

When asked if that was why he "pulled out a gun and started shooting," Lee simply said, "No comment." The detective said, "So I'm tryin' to figure out what these people are doin' too in that immediate second [before the shooting] that … caused you … to have fear." Lee replied, "When [Tibbs] walked [back] into the store and he

10.

said 'Hey.' I don't know who he was speaking to in the store. But it – under my impression I'm thinkin' that they gonna come back out and do what they did to me again."[11]

When asked, "Did you go there planning to do this?" Lee cryptically replied, "No, not necessarily." As to why he chose that particular night, Lee stated, "I just got tired of being stuck in … boxed in and being scared. So I forced myself to build up enough courage to basically say, 'I'm not going to let you just do me like this and keep bullying me and threatening me and all the things you do.' So I reacted the way I reacted because I – I was – I'm scared and I was tired of being cooped up in the corner…."[12] Presumably speaking about Tibbs, Lee said:

> "Because it's like – it speaks for itself. You beat me up. You come back the next day with some other guy or actually some other guys come back the next day, humiliate me and then try to bully me even more. And then when I'm up there again you sayin' [H]ey. It's like what do you expect me to think when you already jumped me. And then these guys are already threatenin' me and then puttin' it on the internet to humiliate me with threats."

---

[11] However, no one came out. Given that the bullet holes were located in the *closed* glass door and in *interior* walls, the downward trajectory of the fatal shot, and where Tibbs was found when police arrived, the reasonable inference is that Tibbs was seated inside the shop when he was shot and no one else had come in or out of the door.

[12] During all of his police interviews, Lee repeatedly came back to bullying as an underlying motivation for his actions, and not only just having been bullied in May 2020: "It's about bein' bullied. And me bein' bullied *for years straight on a continuous basis*[.]" "Just got tired of bein' bullied. That's about as much as that I can say. Just got tired of bein' bullied period." "I lost my family behind all this and all of that because they felt like I was a weak person and this and this. And basically just got bullied into bein' less of a man." "They knew for a fact that they can bully me and get away with it 'cause *it's been goin' on for years* and — and that hurt a person's pride. That hurt a person's ego. . . . Especially when you lose everything, your wife lookin' at you as less of a man. Your kids hearin' about oh, your dad peed on hi[m]self at the store in an incident." (Italics added.)

# **DISCUSSION**

## I. The Self-Defense Jury Instructions

### A. Additional Factual Background

Lee's trial counsel asked the court to instruct the jury on perfect self-defense, as laid out in CALCRIM No. 505. That instruction tells the jury that a defendant is not guilty of murder if he or she was justified in killing in lawful self-defense. To be lawful, a defendant must have *actually and reasonably* believed he or she was in imminent danger of being killed or suffering great bodily injury, that the *immediate* use of deadly force was necessary to defend against that danger, and the defendant used no more force than was *reasonably necessary* to defend against that *imminent danger*. (See CALCRIM No. 505.) Moreover, not only must a defendant's beliefs have been reasonable, he or she must have acted *only* because of those beliefs. (*Ibid.*)

The trial court "rejected [CALCRIM No. 505], specifically recognizing that the Court must find that there is substantial evidence to support giving an instruction." Although the court indicated there was evidence that Lee may have harbored a belief in the need for self-defense, it found there was not substantial evidence that this belief "would have been reasonable under the circumstances of this case[.]"

Instead, the court instructed on imperfect self-defense, using CALCRIM No. 571, and in pertinent part told the jury:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense.

> "The defendant acted in imperfect self-defense if:

> "1. The defendant actually believed that he was in imminent danger of being killed or suffering great bodily injury;

> "AND

12.

"2.  The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

"BUT

"3.  At least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"A danger is imminent if, when the fatal wound occurred, the danger actually existed or the defendant believed it existed.  The danger must seem immediate and present, so that it must be instantly dealt with.  It may not be merely prospective or in the near future. [¶] … [¶]

"If you find Jerry Tibbs, Jr. threatened or harmed the defendant in the past, you may consider that information in evaluating the defendant's beliefs.

"If you find the defendant knew Jerry Tibbs, Jr. threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.

"If you find the defendant received a threat from someone else that he associated with Jerry Tibbs, Jr., you may consider that threat in evaluating the defendant's beliefs. [¶] … [¶]

"The People have the burden of proving beyond a reasonable doubt the defendant was not acting in imperfect self-defense.  If the People have not met this burden, you must find the defendant not guilty of murder."  (CALCRIM No. 571, italics omitted.)

Lee's trial counsel also asked the court to modify CALCRIM No. 571 by adding a pinpoint instruction containing language borrowed from the refused perfect self-defense instruction:  "A defendant threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person;" and "A defendant is not required to retreat.  He or she is entitled to stand his or her ground and

13.

defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger has passed. This is so even if safety could have been achieved by retreating."

The court acknowledged that Lee's requested modifications of CALCRIM No. 571 were "a correct statement of the law as set forth in the instructions related to Perfect Self-Defense," but refused to insert them into the imperfect self-defense instruction.

### B. Legal Background

"Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that … is however predominantly legal. As such, it should be examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) Thus, "[w]e review the trial court's decision de novo. In so doing, we must determine whether there was indeed sufficient evidence to support the giving of [an] instruction." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206; see *People v. Simon* (2016) 1 Cal.5th 98, 132–133 (*Simon*) [analyzing court's refusal to give an imperfect self-defense instruction]; cf. *People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*) ["a trial court may properly refuse an instruction offered by the defendant if it … is not supported by substantial evidence"].)

It is well-settled that a trial court has a sua sponte duty to instruct on the basic principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Brooks* (2017) 3 Cal.5th 1, 73 (*Brooks*).) As a result, "[t]he trial court is charged with instructing upon every theory of the case *supported by substantial evidence*, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047, italics added; see *People v. Thomas* (2023) 14 Cal.5th 327, 385 (*Thomas*) [" '[A] trial court must instruct on general principles of law relevant to the issues *raised by the evidence* and necessary for the jury's understanding of the case.' " (Italics added.)].)

"Substantial evidence supporting sua sponte instruction on a particular defense is evidence that is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable [persons] could have concluded' " ' that the

particular facts underlying the instruction did exist." (*Brooks, supra,* 3 Cal.5th at p. 75; *People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 ["evidence that a reasonable jury could find persuasive"].) Nevertheless, " '[s]peculative, minimal, or insubstantial evidence is insufficient….' " (*Thomas, supra,* 14 Cal.5th at p. 385.) "Although a trial court should not measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, the court need not give the requested instruction where the supporting evidence is minimal and insubstantial." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145, fn. omitted.) " ' "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused." ' " (*People v. Steskal* (2021) 11 Cal.5th 332, 345 (*Steskal*).)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) As applied to murder, "[t]he doctrine of self-defense embraces two types: perfect and imperfect." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.)

"A killing in perfect self-defense is justifiable homicide. [Citation.] Perfect self-defense requires that 'one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.' [Citations.] 'To satisfy the imminence requirement, "[f]ear of future harm — no matter how great the fear and no matter how great the likelihood of the harm — will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." ' [Citation.] ' " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' " ' " (*Thomas, supra,* 14 Cal.5th at pp. 385–386, original italics.)

Moreover, "[a] bare fear … is not sufficient to justify [a homicide]. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears *alone*." (§ 198, italics added; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1045 (*Nguyen*) [discussing "fear alone"]; see also *People v. Kaihea* (2021) 70 Cal.App.5th 257, 265 (*Kaihea*) ["evidence of motive is relevant to refute a claim of self-defense"].)

15.

Thus, " '[t]he justification of [perfect] self-defense requires a double showing: that defendant was actually in fear of his life or serious bodily injury and that the conduct of the other part[ies] was such as to produce that state of mind in a reasonable person.' " (*People v. Watie* (2002) 100 Cal.App.4th 866, 877.) This constitutes an objective assessment of the defendant's perceived need to defend, and "[t]he ultimate question is whether a reasonable *person* . . . would believe in the need to kill to prevent imminent harm." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1087 (*Humphrey*), original italics.) Moreover, because it is an objective inquiry our Supreme Court rejected the "adoption of a ' "reasonable gang member" standard[]' " for the jury to consider in assessing "whether [a] defendant's belief and, ultimately, [his or] her actions were objectively reasonable." (*Ibid.*)

"Imperfect self-defense, on the other hand, 'occurs when a defendant acts in the actual but *unreasonable* belief that he or she is in imminent danger of great bodily injury or death.' [Citation.] Imperfect self-defense reduces an intentional, unlawful killing to voluntary manslaughter, a lesser included offense of murder, by negating a defendant's malice." (*Thomas, supra,* 14 Cal.5th at p. 386, italics added.) As a result, "imperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter." (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; see also *Simon, supra,* 1 Cal.5th at p. 132 [imperfect self-defense voluntary manslaughter is a lesser included offense of murder not an affirmative defense].)

Even so, the imperfect self-defense doctrine "is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears immediate harm that ' " '*must be instantly dealt with*.' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 98, original italics.) " 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or

16.

great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' [Citation.] '[J]ust as with perfect self-defense or any defense, "[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*." ' " (*Nguyen, supra,* 61 Cal.4th at pp. 1048–1049, original italics.)

"The subjective elements of [perfect] self-defense and imperfect self-defense are identical. Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury. To require instruction on either theory, there must be evidence from which the jury could find that appellant actually had such a belief." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.) Nevertheless, a trial court is not obligated to instruct on both theories of self-defense merely because it instructed on one of them. (*People v. Hill* (2005) 131 Cal.App.4th 1089, 1103 (*Hill*), overruled on other grounds in *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5 ["the concepts of unreasonable self-defense and perfect self-defense are independent, and the giving of instructions on the former does not compel instructions on the latter theory of defense"]; cf. *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1276 ["[W]e reject defendant's contention the trial court was required sua sponte to instruct on imperfect self-defense because it instructed on perfect self-defense."].)

Similarly, if there was no substantial evidence of an *imminent* danger of great bodily injury or death, a trial court does not err by refusing to instruct on *either* theory of self-defense. (See *Simon, supra,* 1 Cal.5th at p. 134 [because there was not substantial evidence supporting the defendant's actual belief of imminent danger of death or great bodily injury, the trial court would not have erred had it refused to instruct on *either* form of self-defense].)

## C. Failure to Give a Perfect Self-Defense Instruction

Lee first claims that the trial court's refusal to instruct the jury on perfect self-defense was reversible error. His arguments and authorities primarily focus on *why* he was fearful and whether that fear was justified, but where Lee fails is his inability to point to substantial evidence that would show that his fears were reasonably related to

*imminent* death or great bodily injury. Rather, at best, Lee's fears were that death or great bodily harm would *someday* be realized and he believed he needed to strike first, i.e., to become as he put it the "aggressor," and eliminate or at least minimize that possibility. As such, he was not entitled to perfect self-defense instructions.

It must be reiterated at the outset that for either perfect or imperfect self-defense, the fear must be of *imminent* harm. We "emphasize what should be obvious. Fear of future harm — no matter how great the fear and no matter how great the likelihood of the harm — will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." (*In re Christian S.* (1994) 7 Cal.4th 768, 783 (*Christian S.*), original italics; *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305 ["The danger must be imminent; mere fear that it will *become* imminent is not enough." (Italics added.)]; see also *Humphrey, supra,* 13 Cal.4th at p. 1094 (conc. opn. of Brown, J.) ["A previous threat, unaccompanied by any demonstration of an immediate intention and ability to carry it out, will not justify an assault."].) " ' "An imminent peril is one that, from appearances, must be instantly dealt with." ' " (*Christian S., supra,* 7 Cal.4th at p. 783, italics omitted; see *People v. Aris* (1989) 215 Cal.App.3d 1178, 1189 (*Aris*), overruled on other grounds in *Humphrey, supra,* 13 Cal.4th at p. 1089 ["the criminal law will not even partially excuse a potential victim's slaying of his attacker unless more than merely threats and a history of past assaults is involved"].)

Under the circumstances presented here, there was no substantial evidence that Tibbs presented an imminent danger to Lee that had to be instantly dealt with at the moment when he opened fire. (See *Steskal, supra,* 11 Cal.5th at pp. 346-347 [no imminent danger when defendant was the "aggressor," and opened fire on sheriff's deputy as he drove up to a 7-Eleven, still seated in his car, and before he had an opportunity to access his own weapon].)

It is true that evidence of prior threats may be relevant to self-defense even where the threats have not been made by the actual homicide victim, but by members of a group who in the defendant's mind are reasonably associated with the victim. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1067 (*Minifie*) [" 'evidence of threats from the victim's

18.

associates may be used in support of a claim of self-defense "to show that the defendant had reason to think his life in danger" ' "].)  Nevertheless, "antecedent threats" are only probative  " 'when the threats are followed by some "overt act" that has placed the defendant in *immediate* danger.' " (*Minifie, supra,* 13 Cal.4th at p. 1069, italics added.)

Similarly, " ' "previous threats alone, … unless coupled at the time with an apparent design then and there to carry them into effect, will not justify a deadly assault…." ' " (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1359 (*Curtis*); see also *People v. Duchon* (1958) 165 Cal.App.2d 690, 693 ["There can be no reasonable ground for apprehending harm in the absence of some overt act or physical demonstration."]; *People v. Lucas* (1958) 160 Cal.App.2d 305, 310 ["[T]hreats alone, unaccompanied by some act which induces in defendant a reasonable belief that bodily injury is about to be inflicted, do not justify a homicide."].)

There was no substantial evidence from which the jury could have concluded Lee killed Tibbs due to an actual and reasonable belief that he needed to defend himself from an imminent threat to his life from Tibbs.  Lee did not say he believed he had to kill Tibbs to defend himself from an imminent threat posed by Tibbs.  There was no evidence Tibbs was involved in the Facebook exchange or made any threats online, and Tibbs was not present in the liquor store when Lee was threatened to the point of urination. Although Tibbs had been there when Lee got roughed up behind the dispensary on May 19, Tibbs only took swings at Lee and missed, and it was the others who subsequently beat up Lee.

Tibbs was not even outside the dispensary when he was shot but was instead sitting in a chair behind a closed glass door inside the shop.  No one else had come out of the shop except the woman who Lee thought was an "innocent" customer or employee, and whom he did not shoot.  There was no evidence Tibbs was armed or that Tibbs was even aware of Lee's presence while Lee was sneaking around in the parking lot outside the shop.  All Lee supposedly relied upon before opening fire was his claim that *someone* yelled, "Hey" at about the same time Tibbs had turned around and re-entered the dispensary after the woman left.

19.

Similarly, nothing in the Facebook threats was specific as to when and where the threats were to be carried out, or by whom, and none was a death threat. There was no one else immediately present, East Siders or otherwise, when Tibbs was killed. Indeed, Tibbs was merely sitting inside the shop when he was shot and no one else was hit by the other four shots. The mysterious "Hey" did not constitute substantial evidence — that is, evidence from which a jury composed of reasonable persons could find — that Lee reasonably feared *imminent* great bodily injury or death from an unarmed man sitting behind a closed door inside the dispensary. (Cf. *People v. Rogers* (2006) 39 Cal.4th 826, 883–884 (*Rogers*) [not error for failing to instruct even on *imperfect* self-defense when the defendant, "a deputy sheriff armed with a revolver" shot "an unarmed 15-year-old girl" when she was walking toward him with her finger pointing at him].)

Furthermore, for perfect self-defense "the party killing must have acted under the influence of such fears *alone*." (§ 198, italics added; *Nguyen, supra,* 61 Cal.4th at p. 1045.) Lee admitted he was not solely motivated by a fear of imminent death or great bodily injury in killing Tibbs. He labeled himself the "aggressor," and said he was also motivated by embarrassment, shame, and a desire to end years of being bullied, none of which was directly attributable to Tibbs. "The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense." (*Ibid.*) Such is the case here.

This appears to have been a preemptive strike in Lee's mind: he would take out his perceived enemies before they had a chance to get him; Tibbs just happened to be the first one he saw. As Lee told the detectives, "I made that decision to be sure that I wouldn't die first. … I just felt like I had to take care of business before these guys killed me." It "[s]ounds … like it's premeditated but … I had to do what I had to do because I was going to die. Point blank, period…. These guys was going to kill me." Perhaps someday, but when, and why Tibbs?

As we have emphasized, self-defense is valid only if the defendant fears imminent harm. Fear of future harm does not justify the kind of tactical preemptive strike Lee used

20.

here in the name of self-defense. (*Curtis, supra,* 30 Cal.App.4th at pp. 1359-1360, citing *People v. Scoggins* (1869) 37 Cal. 676, 683-684.) Moreover, when a defendant acts out of fear *and* other passions by making an anticipatory strike toward someone who may not even know the defendant is present, the defendant might arguably be described as acting based on all those intense emotions, but he or she may not reasonably be described as having acted in self-defense *only* in response to a threat of death or great bodily injury.

Tibbs was ambushed, not killed in self-defense. Though Lee's fears and passions may be understandable in the abstract, the law does not countenance the kind of preemptive strike involved here in the name of self-defense. For these reasons, there being no substantial evidence to justify it, the trial court did not err in failing to instruct on the doctrine of perfect self-defense.

**D. Failure to Modify the Imperfect Self-Defense Instruction**

Lee alternatively claims the trial court prejudicially erred by refusing to modify the imperfect self-defense instruction to include language taken from the perfect self-defense instruction. We are not persuaded.

As discussed above, " 'a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' " (*Thomas, supra,* 14 Cal.5th at p. 385.) This may include providing, upon request, "legally correct and factually warranted pinpoint instructions designed to elaborate and clarify other instructions…." (*People v. Hughes* (2002) 27 Cal.4th 287, 362.) When considering whether to give a pinpoint instruction requested by a party, the court should consider whether the instruction incorrectly states the law, is argumentative, duplicative, potentially confusing, or is not supported by substantial evidence. (*Moon, supra,* 37 Cal.4th at p. 30.) The court can refuse pinpoint instructions that "highlight" specific evidence because this "type of instruction 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence,' [and] is considered 'argumentative' and therefore should not be given." (*People v. Earp* (1999) 20 Cal.4th 826, 886.)

Lee's trial counsel asked that two paragraphs taken in part from the perfect self-defense instruction be added to the imperfect self-defense instruction: "[S]omeone threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person;" and "[A] defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger has passed. This is so even if safety could have been achieved by retreating."

On appeal, Lee has not resurrected the failure to give a "retreat" instruction and we therefore deem it abandoned. Instead, he focuses on his contention that "the court here erred by refusing to instruct that a person who has been violently attacked by the decedent or associates is justified in reacting more quickly or harshly because that precept was central to appellant's defense." Throughout his briefing, he refers to this proposed modification as "the antecedent threat instruction."

First, Lee implies that *no* antecedent threat instructions were given, and it was therefore prejudicial error. However, the court did instruct on prior threats: "If you find Jerry Tibbs, Jr. threatened or harmed the defendant *in the past*, you may consider that information in evaluating the defendant's beliefs. [¶] If you find the defendant knew Jerry Tibbs, Jr. had threatened or harmed others *in the past*, you may consider that information in evaluating the defendant's beliefs. [¶] If you find the defendant received a threat *from someone else that he associated with Jerry Tibbs, Jr.*, you may consider that threat in evaluating the defendant's beliefs." (Italics added.)

Thus, when properly framed, Lee's complaint is not that there were *no* antecedent threat instructions given, but that the jury was not also told that those earlier threats may be used to indicate that Lee was "*justified* in acting more quickly or taking greater self-

22.

defense measures" against Tibbs "because that precept was central to appellant's defense."[13] (Italics added.)

However, as Lee admits in his briefing, this additional language was needed only because it "focuses the jury on the *reasonableness* of the defendant's belief," and the "*reasonableness* of defendant's conduct." Similarly, he argues that "[i]nstructing that a *reasonable person* in such a situation 'is justified in acting more quickly and taking harsher measures . . . in the event of an assault . . . than would a person who had not received such threats' would have focused the jury's attention on the reality of [Lee's] circumstances as no standard self-defense instruction does."

But that is the point: the *reasonable* person, no matter how he or she is defined in a particular context, is irrelevant to imperfect self-defense, which by definition is predicated on an actual and *unreasonable* belief in a need for self-defense. A trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law. (*Moon, supra,* 37 Cal.4th at p. 30.) Importing a reasonable person standard into an imperfect self-defense instruction would incorrectly state the law of imperfect self-defense, and the trial court properly denied Lee's modification of CALCRIM No. 571.

Expanding further on "reasonableness," Lee also claims that: "The question is not whether appellant's *fear* was reasonable but whether his *reaction to that fear* was reasonable. The missing [pinpoint part of the perfect self-defense] instruction would have told the jury that one who has received credible threats against his life 'is justified in acting more quickly and taking harsher measures' for his protection than one who has not received prior threats." (Original italics.)

It is unclear what Lee means by the term "justified" if it is not "reasonable," in which case it again is irrelevant. Moreover, he provides no authority for a "justified" reaction claim in an imperfect self-defense context. Indeed, imperfect self-defense does

---

[13] Even without the specific pinpoint instructions she requested, Lee's trial attorney was permitted to fully argue "along those lines and in that vein," and she did; she protested that mere argument was insufficient.

not result in a *justified* killing; it merely negates malice and reduces the crime of murder to manslaughter.

Furthermore, for imperfect self-defense the question is whether a defendant's *beliefs* were actual but unreasonable. There is no mention about a defendant's *reaction* to his beliefs, whether reasonable or unreasonable, and telling the jury that a defendant may *react reasonably* to an *unreasonable* belief would not only misstate the law but would very likely confuse them.

Simply put, the language Lee wanted taken from the perfect self-defense instruction was meant to tell the jury that it may consider antecedent threats as a factor in determining that a reasonable person's beliefs in the need for self-defense were still reasonable even if he or she may have acted "more quickly and [took] harsher measures for his [or her] protection" than would a reasonable person who had not received the prior threats. It therefore has no place in an imperfect self-defense instruction.[14]

Finally, Lee argues the trial court's refusal to modify CALCRIM No. 571 was error because the court was "reluctant" to tamper with the standard instructions when the standard instructions do not carry the force of law.

First, we review claims of instructional error de novo, not the reasons the trial court gives for using or not using them. Second, we do advise that a trial court should avoid modifying model instructions, particularly the CALCRIM instructions.[15] Third,

---

[14] In support of his attempt to shoehorn reasonableness into imperfect self-defense — which by definition is predicated on unreasonableness — Lee cites several cases to bolster his claim that the antecedent threat paragraphs from the perfect self-defense instruction should have been added to the antecedent threat paragraphs of the imperfect self-defense instruction. (*People v. Moore* (1954) 43 Cal.2d 517; *People v. Gonzales* (1992) 8 Cal.App.4th 1658; *People v Pena* (1984) 151 Cal.App.3d 462; *People v. Bush* (1978) 84 Cal.App.3d 294; *People v. Torres* (1949) 94 Cal.App.2d 146.) We find them distinguishable because none was an imperfect self-defense case; all were perfect self-defense and/or heat of passion cases. Lee cites no case holding that the antecedent threat paragraphs taken from perfect self-defense should, or even could, be added to an imperfect self-defense instruction, and we have found none.

[15] "The California jury instructions approved by the Judicial Council are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050,

24.

and more importantly, a trial court is not obligated to disregard the standard instructions merely to permit pinpoint instructions that incorrectly state the law.

There is no hybrid self-defense theory that incorporates parts of perfect self-defense and its reasonableness predicates with imperfect self-defense, but Lee's proposed pinpoint instruction attempted to do just that. As such, it was properly refused. In essence, Lee's claim about the denial of his pinpoint instruction to supplement the imperfect self-defense instruction is simply a rehash of his earlier arguments that the jury should have been instructed on *perfect* self-defense; a claim which we have already rejected.[16]

---

subd. (a).) The CALCRIMs are such instructions. (See *People v. Lucas* (2014) 60 Cal.4th 153, 294, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19 [CALCRIMs "are now endorsed and viewed as superior" to the old CALJIC instructions by the Judicial Council])

[16] Lee tries to couch his instructional error claims in constitutional terms, contending the trial court's rulings on both the perfect and imperfect self-defense instructions violated his 6th and 14th Amendment rights "to present a full defense." Even though the trial court earlier granted Lee's in limine motion to "federalize" any *evidentiary* objections under those Amendments, no constitutional objections were made to the trial court's denial of his requests regarding the self-defense instructions.

"Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal. [Citations.] As the United States Supreme Court recognized in *United States v. Olano* [(1993) 507 U.S. 725, 731] ' "[n]o procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.) To that extent, Lee's constitutional claims were forfeited.

Forfeiture notwithstanding, "[n]o separate constitutional discussion is required … when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time [on appeal]." (*People v. Scott* (2011) 52 Cal.4th 452, 487, fn. 29; *People v. Scott* (2015) 61 Cal.4th 363, 394–395 ["Rejection of a claim on its merits necessarily disposes of the additional constitutional 'gloss'."]; *People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7; *People v. Wallace* (2008) 44 Cal.4th 1032, 1050, fn. 4.) So too here.

### E. Conclusion

We end where we began: the dispositive question in this case is imminence. Whether for perfect or imperfect self-defense, whether for reasonable or unreasonable beliefs, one important aspect of the law of self-defense is the same for both: "Belief in *future* harm is not sufficient, no matter how great or how likely the harm is believed to be." (CALCRIM Nos. 505 and 571, italics added.) Simply put, the imminence requirement is the same for perfect and imperfect self-defense. (*Aris, supra,* 215 Cal.App.3d at p. 1185 ["the settled law in California requires an [actual] belief that the killer is in *imminent* danger of death or great bodily injury from the victim for both perfect and imperfect self-defense"].) If there is not *substantial* evidence of imminent danger, instructions on either form of self-defense do not apply. (*Simon, supra,* 1 Cal.5th at p. 134 [because there was not substantial evidence supporting imminent danger of great bodily injury or death, the trial court would not have erred had it refused to instruct on either form of self-defense].)

As Lee told the police, he had become the "aggressor," not the defender: "I forced myself to build up enough courage to basically say, 'I'm not going to let you just do me like this and keep bullying me and threatening me and all the things that you do.' So I reacted the way I reacted because I – I was – I'm scared and I was tired of being cooped up in the corner…."

Two weeks before the shooting, in his May 19 self-video, Lee had said:

"[T]hey wanted to jump me today [inaudible] hurt me. *I have no choice 'cause I'm definitely sure that I'm gonna go to jail but what they did to me is not acceptable.* So, I have to defend myself because now, I'm in fear that they gonna come back and do something more to me knowing that I'm on the streets. That being said, *I'm gonna end it right here* because I'm going to be [inaudible] who did what they did to me. Police [inaudible] car and watch everything that happened. To be continued." (Italics added.)

Later, when a detective asked Lee about the night of the shooting, "You felt like your life was in imminent danger?" Lee replied "I *already knew* my life was in imminent danger. *I shouldn't even have been up there.*" (Italics added.) "The things that I did, the

26.

way I went about it, was wrong.  Because, uh, after the fact, it was more like I became the aggressor afterwards because of my mental anguish."  To repeat: Lee shot Tibbs because of his pent-up mental anguish, not because of his fear of *imminent* great bodily harm or death.

The imminence requirement "reflects the great value our society places on human life.  The criminal law would not sentence to death a person … for a murder he merely threatened to commit, even if he had committed threatened murders many times in the past and had threatened to murder the defendant; it follows that the criminal law will not even partially excuse [under imperfect self-defense] a potential victim's slaying of his attacker unless more than merely threats and a history of past assaults is involved."  (*Aris, supra,* 215 Cal.App.3d at p. 1189.)

Lee had gone to the liquor store two hours before the shooting, when it was still light out, made a purchase and left without incident and without going near the dispensary.  He returned later, when it had gotten dark, went around back, approached the dispensary from the south, and when he saw Tibbs and supposedly heard someone say "Hey," he "end[ed] it right [th]ere."

After all he had been through, combined with his belief that all the bad things in his life would continue unless he did something, he had finally had enough.  He apparently decided he was at least going to ensure that some of his future-looking fears would never happen, i.e., before they became imminent.  In other words, the way he made sure that some of his fears would never truly *become* imminent was by going back to the dispensary that night and, before anything else happened and with no threat that must be instantly dealt with, kill Tibbs.  In sum, because there was no substantial evidence of an immediate need to resort to lethal force in self-defense at that point, the trial court did not err in instructing the jury in the manner it did.

27.

## II. Remand for Resentencing

Lastly, Lee contends that we must vacate his sentence and remand the matter because of three legislative changes to the sentencing laws that have been made since he was sentenced in September 2021.

The People concede that remand is necessary as to one of those changes, but do not take a position on the other two, concluding the issue is moot because at resentencing the trial court will be required to apply them anyway.

We accept the People's concession, but to assist the trial court on remand, we include a brief discussion as to all three amended sections because all will apply at the resentencing hearing. (See, e.g., *People v. Bautista-Castanon* (2023) 89 Cal.App.5th 922, 926–928.)

### A. Section 654 (Assembly Bill No. 518)

Under section 654, when a defendant faces convictions for acts or omissions "punishable in different ways by different provisions of law," that defendant may face punishment under either provision, but not both. Lee was convicted in four counts for the same act: murder, by firing a gun into an occupied building, while being a felon in possession of a gun and ammunition. The court imposed its base term sentence on the murder and imposed and stayed the execution of the sentences on the other three counts under section 654.

Until recently, section 654 required trial courts to impose a sentence "under the provision that provide[d] for the longest potential term of imprisonment." (Former § 654.) "In 2021, however, the Legislature enacted Assembly Bill No. 518 [(2021−2022 Reg. Sess.)] (Stats. 2021, ch. 441), which removes the requirement to impose the longest prison term." (*People v. Sek* (2022) 74 Cal.App.5th 657, 673 (*Sek*).) As a result, a trial court now may exercise its discretion to select any provision as the base term, but not necessarily the one that imposes the longest sentence. (*Ibid.*)

28.

Assembly Bill No. 518 applies retroactively to cases that were not final on January 1, 2022. (*Sek, supra,* 74 Cal.App.5th at p. 673; accord *People v. Mani* (2022) 74 Cal.App.5th 343, 379.) This is such a case. On remand, the court must therefore be given an opportunity to exercise its discretion to select a different base term and stay the sentences on the other convictions if it so chooses.

**B. Section 1385 (Senate Bill No. 81)**

In 2021 the Legislature also enacted Senate Bill No. 81 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1), which amended section 1385 to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. (See § 1385, subd. (c)(2)(B), (C), & (E).) "These requirements 'shall apply to sentencings occurring after the effective date of' Senate Bill No. 81." (*Sek, supra,* 74 Cal.App.5th at p. 674.)

Section 1385, subdivision (c)(1) now provides that an enhancement should be dismissed whenever its application could result in a sentence longer than 20 years "if it is in the furtherance of justice to do so." In exercising its discretion under this subdivision, "the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances … are present," including, as here, the circumstance that "[t]he application of [the] enhancement could result in a sentence of over 20 years," provided, however, "*unless the court finds that dismissal of the enhancement would endanger public safety*." (§ 1385, subd. (c)(2), (c)(2)(C); italics added.)

Because we are otherwise remanding the matter for resentencing, the resentencing in this case will necessarily take place after Senate Bill No. 81 became effective on January 1, 2022, and the changes made to section 1385 will therefore apply. (*Sek, supra,* 74 Cal.App.5th at p. 674.)

Even so, on remand the trial court still retains discretion to decide whether to impose the enhancement notwithstanding the "shall be dismissed" language in

section 1385, subdivision (c)(2)(C), if it finds that dismissal of the enhancement would endanger public safety. (*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 18–20, rev. den. Mar. 22, 2023, S278429; accord *People v. Mendoza* (2023) 88 Cal.App.5th 287, 297, rev. den. Apr. 26, 2023, S279144.)

### C. Section 1170 (Senate Bill No. 567)

On count 2, the trial court imposed a 42-years-to-life sentence and stayed it pursuant to section 654. It was calculated based on an *upper* term of seven years, plus 25 years to life for the gun-use enhancement, plus 10 years for the two serious felony priors. (See §§ 667, subd. (e)(2)(A)(iii), and 1170.12, subd. (c)(2)(A)(iii).) Similarly, the court imposed *upper*-term sentences of three years, doubled to six under the Three Strikes Law, for the felon in possession of a firearm and ammunition counts, and also stayed them under section 654.

Senate Bill No. 567 (2021–2022 Reg. Sess.) amended section 1170 and, among other things, created a presumption in favor of a *low*-term sentence in certain circumstances. (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (b)(2), and (b)(6).)[17] Specifically, section 1170, subdivision (b)(6) now provides: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court *shall order imposition of the lower term* if any of the following was a contributing

---

[17] Three bills amending section 1170 were enacted and signed into law on the same date during the 2021–2022 Regular Session: Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3); Assembly Bill No. 124 (Stats. 2021, ch. 695, § 5); and Assembly Bill No. 1540 (Stats. 2021, ch. 719, § 2). Senate Bill No. 567 takes precedence over the other two because it bears the highest chapter number and was enacted last. (Gov. Code, § 9605, subd. (b); *In re Thierry S.* (1977) 19 Cal.3d 727, 738–739.) Senate Bill No. 567 states that if all three bills amending section 1170 are enacted and become effective on or before January 1, 2022, and it is enacted last, then section 1.3 of that bill, which incorporates the amendments proposed by all three bills, shall become the operative law. (Stats. 2021, ch. 731, § 3.)

factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence…." (§ 1170, subd. (b)(6), italics added.)

The People concede and we agree that new section 1170, subdivision (b) applies retroactively to this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (See *People v. Dunn* (2022) 81 Cal.App.5th 394, 402–403, review granted Oct. 12, 2022, S275655; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465; *People v. Flores* (2022) 75 Cal.App.5th 495, 500; see *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308 [the "*Estrada* rule"[18]].)

Lee claims "the appellate record is rife with [his] past physical trauma, including being beaten at the direction of the man he ultimately shot,[19] and gang harassment so physically frightening he urinated on himself. These circumstances could support a finding that prior trauma played a role in appellant's commission of the offense, thereby triggering the presumption that low-term sentences are appropriate." While not expressing any opinion whether this is true or not, it appears section 1170, subdivision (b)(6)(A) may potentially be implicated, and on remand the trial court must therefore address the issue in the first instance.

Relevant to that inquiry, we note that even before section 1170, subdivision (b)(6)(A) became operative, in *People v. Keelen* (1998) 62 Cal.App.4th 813, 815 (*Keelen*), the court found that trial courts retain discretion under section 1170, subdivision (b) to select the upper, middle, or lower term even when calculating an indeterminate third strike sentence.

---

[18] *In re Estrada* (1965) 63 Cal.2d 740.

[19] This misstates the evidence; there is nothing in the record to indicate Tibbs "directed" anyone to beat Lee up on May 19. In all of his varying accounts of that incident, Lee admitted Tibbs was not even present.

When sentencing on a third strike conviction, a court is required to select the *greatest minimum term of imprisonment* from three options. (§ 667, subd. (e)(2)(A); see *People v. Miranda* (2011) 192 Cal.App.4th 398, 414–417; *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1379–1382.) Option one, as was used in *Keelen, supra,* is calculated as "[t]hree times the term otherwise provided as punishment." (§ 667, subd. (e)(2)(A)(i).) Option two is simply 25 years. (§ 667, subd. (e)(2)(A)(ii).) Option three is first calculated as a *normal conviction under section 1170* plus "any applicable enhancement that would be used to lengthen the term the defendant would receive absent the Three Strikes law." (*People v. Acosta* (2002) 29 Cal.4th 105, 115.)

Here, the trial court employed option three because 42 years to life was the greatest of the three minimum term options: an upper term of seven years for the section 246 offense, plus 25 years to life for the gun-use enhancement, plus 10 years for the two serious felony priors.

However, a violation of section 246 is punishable by three, five, or seven years and, after *Keelen,* under option three the court had discretion to calculate the greatest minimum indeterminate sentence for count 2 as either 38, 40, or 42 years to life, all three of which were greater than the sentences calculated under options one or two. (See *Keelen, supra*, 62 Cal.App.4th at p. 820.)

As a result, when applying newly enacted section 1170, subdivision (b)(6) on remand, the trial court's choice of the upper term of seven years in its calculation must be revisited because 38 years to life would be the new presumptive low-term-based greatest minimum indeterminate sentence.

Similarly, also under new section 1170, subdivision (b)(6), the upper-term basis for Lee's two six-year determinate sentences on counts 3 and 4 must also be vacated and reconsidered because both offenses are punishable by 16 months, two years, or three years, with a now-presumptive term of 16 months, doubled to 32 months under the Three Strikes Law. (§§ 29800, 30305; see § 18, subd. (a).) The trial court must therefore be

given an opportunity to exercise its discretion under section 1170, subdivision (b)(6) as to counts 3 and 4 as well.

We emphasize, however, that section 1170, subdivision (b)(6)(A) does not *require* imposition of the lower term in every case in which a defendant may have experienced psychological or physical trauma. Rather, the provision establishes a *presumption* in favor of the lower term but *only if* the trauma was "a contributing factor" in the commission of the crimes committed *and* "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice.…" (§ 1170, subd. (b)(6)(B).) Those determinations will be made by the trial court on remand.

**D. Conclusion**

The current record before us does not "clearly indicate" the trial court would have made the same sentencing decisions it made in 2021 after the enactments of Assembly Bill No. 518 and Senate Bill Nos. 81 and 567. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [remand is appropriate "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion' "].) Lee is therefore entitled to a full resentencing, at a hearing where the trial court may fully exercise its newly informed discretion. (*People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

"A court conducting a full resentencing also may, as appropriate, revisit sentencing choices such as a decision to stay a sentence [citation], to impose an upper term instead of a middle term [citation], or to impose concurrent instead of consecutive sentences [citation]." (*People v. Valenzuela* (2019) 7 Cal.5th 415, 425.) In other words, the trial court may revisit all of its earlier discretionary sentencing decisions, but in so doing, the court must be cognizant of the changes made to sections 654, 1385, and 1170.

33.

"Application of the amended statutes will require the trial court, at a minimum, to reconsider which triad term to impose for certain counts of conviction and which terms to stay under section 654. [Citations.] As part of that process, the court should also be free to reconsider any other components of the aggregate sentence it crafted in [2021], which in this case included multiple counts of conviction and multiple enhancements." (*People v. Jones* (2022) 79 Cal.App.5th 37, 46.)

Both parties may present their arguments and evidence pertaining to the changes made to any of the now-applicable sentencing laws to the trial court in the first instance. (*People v. Whitmore* (2022) 80 Cal.App.5th 116, 132 ["On remand, the parties are free to argue for the term they believe is appropriate under the applicable law."]; *People v. Lewis* (2022) 86 Cal.App.5th 34, 36 (*Lewis*) ["any arguments arising under newly enacted sentencing legislation should be raised in the trial court in the first instance on remand"].)[20]

---

[20] We hasten to add that after our Supreme Court's recent decision in *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*), the trial court now also has discretion to impose and execute a lesser firearm enhancement than the 25-years-to-life term it imposed under section 12022.53, subdivision (d) on *count 1*, although it may *not* do so on *count 2*. (*Tirado, supra,* 12 Cal.5th at p. 700, fn. 12 [the way the statutes are written, discretion does not apply to 12022.53, subd. (d) findings that are attached to a section 246 charge].)

Relying on *Tirado*, some Courts of Appeal have held that a trial court also has discretion to impose an uncharged lesser included enhancement under section 12022.5, subdivision (a) after striking a greater enhancement under section 12022.53. (See *People v. Fuller* (2022) 83 Cal.App.5th 394, 397, 403, rev. granted Nov. 22, 2022, S276762; *People v. Johnson* (2022) 83 Cal.App.5th 1074, 1080, 1088, rev. granted Dec. 14, 2022, S277196.) However, in *Lewis, supra,* 86 Cal.App.5th at pp. 36, 39, 41, we reached the opposite conclusion.

On September 28, 2022, the Supreme Court granted review of an unpublished Court of Appeal decision that, like *Lewis*, concluded that a trial court lacks such authority. (See *People v. McDavid* (July 14, 2022, D078919) [nonpub. opn.] [Cal.App. Unpub. LEXIS 4364], rev. granted Sept. 28, 2022, S275940.) The Supreme Court also denied the People's request to publish the *McDavid* decision. (*Ibid.*)

Although the issue is not before us in this case, and our high court will resolve the appellate court split and provide the trial courts with appropriate guidance, we suggest

## DISPOSITION

The judgment is affirmed in part, reversed in part, and remanded for further proceedings. The convictions and true findings are affirmed. The sentence is vacated, and the matter is remanded for resentencing.

We express no opinion as to how the trial court should exercise its sentencing discretion on remand. Following resentencing, the superior court clerk is directed to prepare an amended abstract of judgment and forward certified copies to the Department of Corrections and Rehabilitation and any other necessary parties.

SNAUFFER, J.

WE CONCUR:


LEVY, ACTING P.J.


SMITH, J.

---

that if on remand Lee raises the issue at the resentencing hearing, the court exercise its informed discretion and consider whether to strike the section 12022.53, subdivision (d) enhancement on count 1 and instead impose a lesser enhancement under either sections 12022.53 or 12022.5.